**In re Penny Lee McLAREN, Debtor.**

**Kip M. Kaler as bankruptcy trustee for Penny Lee McLaren, Plaintiff,**

v.

**Penny Lee McLaren and Kirby D. McLaren, Defendants.**

Bankruptcy No. 98–31426.
Adversary No. 98–7079.

United States Bankruptcy Court, D. North Dakota.

May 14, 1999.

Richard J. Linnerooth, Fargo, ND, for Debtor.

Kip M. Kaler, Fargo, ND, trustee.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter arises by Complaint filed on November 16, 1998, by Kip M. Kaler, the Chapter 7 Trustee ("Trustee"), against Debtor–Defendant Penny Lee McLaren ("Mrs. McLaren") and her husband, Defendant Kirby D. McLaren ("Mr. McLaren"), alleging, inter alia, that Mrs. McLaren made false statements and oaths in documents filed with this Court in connection with her bankruptcy case, and, further, that the bulk of Mrs. McLaren's claim of homestead exemption is in consequence of a fraudulent conveyance subject to recovery by the Trustee. The Trustee requests that Mrs. McLaren be denied a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(2) and (4); seeks to avoid any fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(A); and requests that a monetary judgment be granted jointly and severally against the McLarens pursuant to 11 U.S.C. § 550. Trial was conducted in this matter before the undersigned on March 18, 1999. Evidence taken in connection with the instant Adversary Proceeding also bears upon, and is determinative of, the Trustee's separate Objection to Exemption filed in the main case on October 16, 1998. Resolution of that Objection is set forth in a separate Order. From the evidence presented at trial and the parties' Joint Statement of Uncontested Facts, the Court finds the following facts to be material to the issues raised, and makes the following conclusions of law:

## I. FINDINGS OF FACT

### 1. The McLarens and the Property at Issue

The McLarens, both in their forties, were married on October 27, 1973. Since that time, they have, for the most part,

been consistently and gainfully employed: Mr. McLaren as a railroad engineer with Burlington Northern & Santa Fe Railway, and Mrs. McLaren, variously, as an accounting clerk, a computer operator, a receptionist, a hotel desk clerk, and an assembly line worker.

For the first thirteen years of their marriage, the McLarens resided in rented accommodation. Eventually, however, they achieved the American dream of purchasing a home—a dream which they then surpassed with the subsequent purchase of investment real estate, and all of which occurred in the following sequence of events:

From 1977 through 1984, the McLarens resided in an apartment located at 702 26th Street North, Fargo, North Dakota ("apartment building"). At that time, the apartment building, which consisted of three units, was owned by Mr. McLaren's parents.

Subsequently, in 1986, the McLarens purchased a home in joint tenancy.[1] The residence is located at 1919 19th Street South, Fargo, North Dakota ("residence"), and constitutes their current homestead. Their original mortgage on the residence was in the amount of $115,760.00.

Shortly thereafter, on December 10, 1986, Mr. and Mrs. McLaren both purchased the apartment building. In this connection, a Warranty Deed dated December 11, 1986, and recorded January 27, 1987, was executed by Mr. McLaren's parents expressly granting both Mr. and Mrs. McLaren the apartment building as joint tenants for the purchase price of $35,000.00.[2] In turn, Mr. and Mrs. McLaren both executed a mortgage on the apartment building in favor of First Federal Savings and Loan of Fargo in the face amount of $35,400.00. The Mortgage was dated December 11, 1986, signed by both Mr. and Mrs. McLaren, and recorded on January 27, 1987. At trial, Mr. McLaren's father stated that, "[he] sold [the apartment building] at a fair price," and that its transfer was not a gift.[3]

### 2. Credit Card Debt and Resulting Transfers

In 1998, the fruit of the McLarens' many years of labor—to wit, relative financial stability—was blemished by Mrs. McLaren's numerous defaults on a significant accumulation of high-interest credit card debt. Mrs. McLaren amassed her sizeable indebtedness throughout much of the 1990s, and was overwhelmed by it in March or April of 1998, when she became unemployed and, consequently, unable to meet even the minimum monthly principal and interest payments on her accounts.[4] At trial, she estimated that her account balances aggregated approximately $36,000.00 at the time of her defaults.[5] Lacking personal income from which to meet any of her obligations, Mrs. McLaren

---

1. The North Dakota Century Code defines a "joint tenancy interest" as being, in pertinent part, "one owned by several persons in equal shares by a title created by a single will or transfer, when expressly declared in the will or transfer to be a joint tenancy...." N.D.C.C. § 47–02–06; see American Standard Life & Accident Ins. Co. v. Speros, 494 N.W.2d 599, 606 (N.D.1993).

2. See footnote 1.

3. The term "gift" is defined in the North Dakota Century Code as being, "a transfer of personal property made voluntarily and without consideration." N.D.C.C. § 47–11–06.

4. For the last several years, Mrs. McLaren was employed by the Comfort Inn, where she performed both front desk and accounting duties. Mrs. McLaren chose to leave that job in early 1998. Before doing so, she gained employment with a Mr. Yasgar, also in the area of accounting. According to Mrs. McLaren, that working arrangement suited neither herself nor her new employer, and both mutually agreed to her leaving his employ several months after she entered it. Since that time, in approximately March or April 1998, Mrs. McLaren has remained unemployed.

5. Several months later, at the time she filed her petition in bankruptcy, Mrs. McLaren's credit card indebtedness stood at $46,833.11.

turned to her husband for assistance in April 1998.

Mr. McLaren agreed to help his wife out of her difficulties, but refused to do so by advancing her the funds necessary to satisfy her debts. Instead, Mr. McLaren contacted, and took his wife to see, an attorney by the name of Richard J. Linnerooth ("Attorney Linnerooth") for legal counsel. In this connection, Mr. McLaren assumed all responsibility for the payment of attorney fees.

According to the McLarens, Attorney Linnerooth advised them, and they agreed, that Mrs. McLaren should seek shelter in bankruptcy.[6] In preparation for doing so, the McLarens stated that he advised them to: (1) refinance their residence; (2) transfer Mrs. McLaren's interest in the apartment building to her husband for consideration; and (3) use the sale proceeds to pay down the newly created indebtedness. In accordance with this plan, Mr. McLaren made application to State Bank of Fargo ("Bank") in June 1998 for a home loan of $112,500.00, offering the residence as collateral. For purposes of the loan, the residence was appraised on June 4, 1998, at a value of $150,000.00 ("1998 residence appraisal"). The loan application was ultimately granted, and on June 26, 1998, Mr. McLaren, alone, issued a promissory note payable to the Bank in the amount of $112,500.00. On the same date, both of the McLarens executed a mortgage on their residence in favor of the Bank. On July 1, 1998, the Bank advanced Mr. McLaren $112,500.00 under the loan agreement.

In applying the loan proceeds, Mr. McLaren satisfied the first mortgage on the residence which, over the years, he and his wife had reduced to $74,457.00; as well as the mortgage on the apartment building, which they had reduced to $12,955.89; and, lastly, purchased his wife's interest in the apartment building for $23,500.00. Regarding this last transaction, Mrs. McLaren executed a Quit Claim Deed on June 26, 1998, which was recorded on the same date, transferring her interest in the apartment building to her husband. Mrs. McLaren testified that she "knew when [she] executed the Quit Claim Deed that [she] was going to file bankruptcy." The deed was duly recorded on the same date. Concomitantly, Mr. McLaren signed a check dated July 3, 1998, and drawn upon his and his wife's joint bank account in the amount of $23,500.00, payable to Mrs. McLaren for what Mr. McLaren alternatively characterized at trial as her "equity" or "interest" in the property.[7] Mrs. McLaren testified that her husband chose

---

**6.** At trial, Mrs. McLaren estimated that she first met with Linnerooth prior to June 4 1998, and possibly in May 1998. She based her estimate upon the following: She decided to file for bankruptcy protection prior to the time when her house was appraised. The appraisal was conducted on or around June 4, 1998.

**7.** Mr. McLaren's views on the subject of his wife's ownership interests in their real property are contradictory and, moreover, noteworthy. First, with regard to their residence, Mr. McLaren recognizes and acknowledges his wife's ownership interest therein, in this respect stating that, *"[w]e're married, [it] belongs to both of us, there is no subdivision."* (Emphasis added.) That interest is one in joint tenancy. Yet, with respect to the apartment building, on which, according to Mrs. McLaren's testimony, he places great sentimental value, Mr. McLaren on the one hand recognizes his wife's former "equity" and "in-

terest" in the property, yet on the other denies it outright, claiming he himself owned the property in its entirety at all times prior to his purchase of her "equity" or "interest" therein.

Not only do these comments contrast markedly with his ownership philosophy concerning the residence, but Mr. McLaren's latter comments are, of course, belied by the documentation of the apartment building's ownership, which, in every respect, originally showed it to be owned in joint tenancy between the McLarens; and by Mr. McLaren's subsequent carrying out of the purchase of his wife's interest, that is, for the sum of $23,-500.00. In the latter respect, Mr. McLaren has, throughout these proceedings, shown and characterized himself to be very frugal and, moreover, with regard to his wife's debts, utterly unwilling to throw good money after bad. It is, then, entirely too disingenuous for him to testify, in substance and effect, that

this figure himself and that she only "assumed [it] was ... fair." In contrast, Mr. McLaren stated that he acted on Attorney Linnerooth's advice in making payment in that sum to his wife.

In any event, Mrs. McLaren was not long in retaining the sale proceeds, for she almost immediately endorsed the check for $23,500.00 to the Bank. The money was then applied to reduce the outstanding balance on Mr. McLaren's promissory note to the Bank from $112,500.00 to $89,000.00. As Mrs. McLaren testified, the check was never more than three feet from Mr. McLaren before it was transferred to the Bank, and "[she] assumed that [she] had to put it into the homestead." According to Mrs. McLaren, she "didn't really have any choice with the money," and, thus, never considered making payment to her creditors with it.[8]

Mrs. McLaren did, however, assume that as a result of the sale of her interest in the apartment building, and of the application of her sale proceeds to her husband's promissory note, her equity in the residence would increase—that is, she assumed that she would derive overall benefit from the interrelated series of transactions to which she was party. These transactions once completed, Mrs. McLaren filed a petition seeking relief under Chapter 7 of the United States Bankruptcy Code ("Code"), 11 U.S.C. § 101 et seq., on August 20, 1998.

3. Bankruptcy Petition, Schedules, and Statements of Financial Affairs

i. Contents

In her Original Schedules, filed contemporaneously with her bankruptcy petition,

he would pay the considerable sum of $23,500.00 for the purchase of simply nothing at all—that is, what he remarked on several occasions at the trial to be the extent of Mrs. McLaren's former ownership interest in the apartment building. As previously noted in these findings, the facts clearly demonstrate otherwise. There can be no doubt of Mrs. McLaren's former ownership interest in the apartment building: her interest was that of a joint tenant.

Mrs. McLaren made, inter alia, the following asset declarations: In Schedule A, "Real Property," Mrs. McLaren listed the current market value of her interest in the residence at $110,000.00, as against a secured claim of $113,000.00. She omitted any specification in the space provided on the form to indicate the extent of her ownership interest in the residence—for example, whether it was hers alone, her husband's, or whether she owned it jointly. In Schedule B, "Personal Property," she listed various items for which she claimed an aggregate current market value of $5,040.00. On Schedule C, "Property Claimed as Exempt," she claimed the full amount of all of the property listed in Schedule B as exempt, and claimed a one dollar exemption in the residence listed in Schedule A. In Schedule D, she listed the secured claim on the residence at $110,000.00. In Schedule F, "Creditors Holding Unsecured Nonpriority Claims," she listed an aggregate $46,833.11 in unsecured credit card debt. Prior to submitting her Schedules with the Court, and in their connection, Mrs. McLaren made the following affirmation:

**DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR**

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 14 sheets plus the summary page, and that they are true and correct to the best of my knowledge, information, and belief.

8. Mr. McLaren's overall testimony at the trial bolsters his wife's statements. Although he once stated that his wife was free to do with the sale proceeds as she wished, he readily conceded that he suffered no anxiety over paying his wife $23,500.00 because he knew the money would be immediately applied to reduce his promissory note. He further testified in this respect that he would not have paid his wife the money if he did not know that it would be immediately applied to the note.

Date 8/7/98

Signature /s/ Penny McLaren

PENNY LEE MCLAREN

A notation at the bottom of this declaration page states: "Penalty for making a false statement or concealing property. Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. § [sic] 152 and 3571."

In her Original Statement of Financial Affairs—which is attached to, and which was filed with, her petition and Original Schedules—at Item 10, entitled "Other Transfers," Mrs. McLaren was asked to "[l]ist all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case." In answer, she made the following affirmative statements:

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
| --- | --- | --- |
| KIRBY MCLAREN<br>....<br>HUSBAND | JULY 1, 1998 | *APARTMENT BUILDING INTEREST*<br>*$12,995.89* |

(Emphasis added.) As with the Schedules, this document was signed under penalty of perjury.

On October 16, 1998, Mrs. McLaren amended her Schedules ("First Amended Schedules"), as follows, in pertinent part: In Schedule A, she reduced the figure indicating the current market value of her interest in the residence from $110,000.00 to $84,561.50; reduced the figure indicating the amount of the secured claim against the asset from $113,000.00 to $89,-500.00 [9]; and, further, indicated that her interest in the asset was joint in nature. In Schedule B, although she halved the value of her interest in household goods and furnishings from that contained in her Original Schedules,[10] she listed for the first time a tax refund of $1,609.00, thereby increasing the total value of assets listed in Schedule B to $5,614.00. In Schedule C, she increased, inter alia, the value of her claimed exemption in her residence from $1.00 to $39,811.50, and also claimed the current market value of the residence to be $84,561.50. In Schedule D, she reduced

the amount of the secured claim on the residence from $110,000.00, to $89,500.00,[11] and listed the market value of the residence at $169,123.00. Again, Mrs. McLaren signed the First Amended Schedules under penalty of perjury.

In her Amended Statement of Financial Affairs, filed along with her First Amended Schedules, Mrs. McLaren, at Item 10, increased her description of the value of the transferred interest in the apartment building from $12,995.89, to $23,500.00, and further, for the first time to the Court, declared her subsequent transfer of that sum to the Bank. Mrs. McLaren signed the Amended Statement of Financial Affairs under the same penalty-of-perjury declaration as was contained in the Original Statement of Financial Affairs, dating the former as October 13, 1998.

On March 16, 1999, Mrs. McLaren amended her Schedules ("Second Amended Schedules") as follows, in pertinent part: In Schedule A, she reduced the fig-

---

9. This figure contrasts with that contained in the parties' own Joint Statement of Uncontested Facts, which is signed by Mrs. and Mrs. McLaren's respective counsel, as well as the Trustee, and which places the amount of the secured claim against the residence at $89,-000.00, a figure which comports with this Court's own calculations thereon.

10. In the Original Schedules, Mrs. McLaren listed full ownership of these items, which she valued at $2,070.00. In the First Amended Schedules, she lists her ownership interest as being only one-half, and thus the value of her interest as being $1,035.00.

11. *See* footnote 8.

ure indicating the current market value of her interest in the residence from $84,561.50 to $75,000.00. In Schedule C, she reduced, inter alia, the value of her claimed exemption in her residence from $39,811.50 to $30,250.00. Mrs. McLaren signed the Second Amended Schedules under the same penalty-of-perjury declaration as contained in the Second Amended Schedules, dated March 15, 1999.

ii. Preparation and Explanation

At or after his first meeting with the McLarens, Attorney Linnerooth provided Mrs. McLaren with a "bankruptcy workbook," which she was instructed to fill out with all pertinent financial data necessary to the preparation and completion of her petition, Schedules, and Statement of Financial Affairs. Mrs. McLaren's testimony regarding her role in filling out this workbook is inconsistent. On the one hand, she testified that she herself filled out the workbook, which is dated July 9, 1998, and that the workbook is filled out entirely in her handwriting. On the other, she testified that she filled out some portions of the workbook, but that her husband filled out others having to do with their real estate holdings. Ultimately, Mrs. McLaren returned a signed "ink copy" of the workbook, that is, the workbook filled out in ink and signed by her, to Attorney Linnerooth.

In pertinent part, the completed workbook provided that: (1) Mrs. McLaren was the "half owner" of the residence; the market value of the residence amounted to $110,000.00; and the amount of the mortgage against it was $113,000.00; (2) Mrs. McLaren had a half interest in the listed household goods and furnishings, which half interest she valued at $1,035.00; (3) neither she nor her spouse was then-entitled to any determined or undetermined amount of "tax refunds or other money"; and (4) she transferred the apartment building to her husband, valuing the transfer at *$46,500.00*. Additionally, Mrs. McLaren answered each of the workbook questions below in the negative, as follows:

50. Do you or your spouse own or have an ownership interest in any automobiles, trucks, trailers, or other vehicles ...? **No**....

....

61. Do any of your creditors have liens, mortgages, or other encumbrances against any of your property? **No**....

62. Do any of your spouse's creditors have liens, mortgages, or other encumbrances against any of his or her property other than those creditors for whom a form was filled out in response to question 61?

**No**. If so, how many debts are owed to those creditors? **None**....

....

83. How much gross income have your received from your employment or business in this calendar year? **$3220.00**

84. How much gross income have you received from your employment or business during each of the last two calendar years? Last year: **$14,392.28** Year before: **$12,725.24**

87. How much income have you received other than from your employment or business during the last two years? **None.**

....

90. Complete the following showing each creditor to whom you or your spouse have paid more than $600 in the last 90 days. **None.**

Further, at some point in this matter, Mrs. McLaren provided her attorney with the 1998 residence appraisal. She testified that after providing Attorney Linnerooth with the appraisal, she relied upon him to make any necessary alterations to the value of her residence on her Schedules. However, she knew, when she originally scheduled the value of her residence at $110,000.00, that the 1998 appraisal had been completed valuing the residence at $150,000.00. Moreover, and with regard to the secured claim of $113,000.00 listed against the residence in the Original

Schedules, Mrs. McLaren knew the actual amount of the secured claim to be less than she stated because she and her husband had purchased the residence in 1986 and had been making payments on their house note ever since, thereby reducing its outstanding balance.

As to any inaccuracies regarding the property which she scheduled as exempt, Mrs. McLaren testified that she "doesn't know what [the term 'exempt'] means and nobody ever explained it to [her]." Yet, she didn't ask Linnerooth to explain the meaning of the term because "[her husband] was with [her] and he knew what was going on."

Further, in explaining the incorrect figure provided on her Original Statement of Financial Affairs at Item 10, that is, listing the value of the apartment transfer at $12,995.89, Mrs. McLaren stated only that she "skimmed through this" before signing the Original Statement of Financial Affairs and "didn't notice that the amount was wrong."

Finally, and in all other respects, Mrs. McLaren either could not or did not explain the source of the inconsistent valuations in the documents which she filed with the Court, or else ascribed any error in them to Attorney Linnerooth or his employees, or both. Nevertheless, she acknowledged at trial that she understood her own obligation to provide true and correct information to the Court in the documents which she filed therewith, and all of which she signed under penalty of perjury, the significance of which she also acknowledged fully comprehending.

## II. CONCLUSIONS OF LAW

By his Complaint, the Trustee argues both for the denial of a bankruptcy discharge to Mrs. McLaren, and for the avoidance and recovery of an allegedly fraudulent transfer made by her to both her husband and the Bank. First, the Trustee argues that Mrs. McLaren should be denied a discharge in pursuant to 11 U.S.C. § 727(a)(4), on the ground that Mrs. McLaren knowingly and fraudulently made false oaths or accounts in connection with her bankruptcy case [12]; and also pursuant to 11 U.S.C. § 727(a)(2), on the ground that Mrs. McLaren intended these transfers to hinder, delay, or defraud her creditors or the bankruptcy estate.

Second, the Trustee argues, inter alia, that the series of transactions through which Mr. McLaren refinanced the residence and purchased his wife's interest in the apartment building were conducted solely to deprive Mrs. McLaren's creditors or the bankruptcy estate of her interest in the apartment building, and so that the McLarens could personally retain the benefit of its value. In this respect, the Trustee argues that Mrs. McLaren's transfer of her interest in the apartment building and her payment of $23,500.00 sale proceeds to the Bank for the benefit of her husband, both constitute fraudulent transfers which may be avoided pursuant to 11 U.S.C. § 548(a)(1)(A), and for which he may seek recovery under 11 U.S.C. § 550. As recovery, the Trustee seeks the value a monetary judgment in the amount of $23,500.00 against Mr. and Mrs. McLaren jointly and severally, and secured by an

12. In this respect, the Trustee's Complaint states:

Specifically, the Debtor made the following false statements, in the Debtor's bankruptcy filing:

a) In Schedule A the Debtor described her homestead real estate as having a value of $110,000, when in fact the Debtor had received an appraisal of the property within two months immediately preceding the filing of her bankruptcy evidencing a value of the property of $150,000.

b) The Debtor scheduled the secured debt against her homestead real estate as being $113,000, when in fact the Debtor knew that the balance on the mortgage against the homestead real estate had been reduced to $89,000 following her payment of $23,500 on that mortgage.

c) The Debtor did not fairly describe in her statement of affairs, the transfer of her interest in the apartment building to her husband, nor did she disclose the $23,500 payment on her husband's $112,500 note.

equitable lien in the McLarens' residence superior to their interest in the same. Finally, the Trustee requests that the bankruptcy estate be awarded its costs and disbursements incurred in pursuit of this action.

With respect to the cause of action for denial of discharge, Mrs. McLaren responds on the one hand that the errors in the documents which she filed with the Court occurred merely through inadvertence, and also raises the defense that she acted only on the advice of counsel in preparing and submitting these documents. With respect to the avoidance and recovery action, the McLarens assert that the evidence does not support a conclusion that the requisite intent existed to find the transfer at issue to be fraudulent. Moreover, they assert that no fraudulent transfer occurred in this matter for the alleged reason that there was *no transfer of a valuable interest.* In this connection, the defendants assert that Mrs. McLaren held no interest, or only a nominal interest, in the apartment building. Instead, they assert that the apartment building was, at all times, the property of Mr. McLaren alone,[13] an argument which presently holds no coin in light of the facts as previously found by this Court. Additionally, Mrs. McLaren again raises the defense of reliance upon attorney advice. Finally, the McLarens, each in their respective briefs, make reference and argument to the Uniform Fraudulent Transfer Recovery Act, as contained within the North Dakota Century Code, a statute which is not implicated by the Trustee's action or Complaint.

### 1. Denial of Discharge

■ It is a drastic remedy to deny a debtor a discharge. Yet, for all its severity, the action is appropriate when taken to countervail debtor mendacity, for, it must always be remembered, a bankruptcy dis-

charge remains the exclusive purview of the honest debtor. *See Kaler v. Craig (In re Craig )*, 195 B.R. 443, 449 (Bankr. D.N.D.1996).

Section 727(a) lists the circumstances which shall result in a denial of discharge. As concerns the instant matter, the statute provides, in pertinent part, as follows:

(a) The court shall grant the debtor a discharge, unless—

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727(a)(4)(A).

■ In light of the policy implications favoring debtors under the Code, this provision must be construed liberally in favor of the debtor and strictly against the objecting party, with the burden of proof thereunder resting squarely upon the latter. *Armstrong v. Lunday (In re Lunday )*, 100 B.R. 502, 506 (Bankr.D.N.D. 1989); *see* Fed.R.Bankr.P. 4005[14]; *United States Fidelity & Guar. Co. v. Hogan (In re Hogan )*, 208 B.R. 459, 461 (Bankr. E.D.Ark.1997) (burden of proof on objecting party). Under the statute, the burden of proof is that of a preponderance of the evidence. *See In re Craig,* 195 B.R. at 449; *First Nat'l Bank of McClusky v. Zinke (In re Zinke )*, 174 B.R. 1017, 1021 (Bankr.D.N.D.1994).

■ This Court first remarked upon § 727(a)(4)(A) in *Seablom v. Seablom (In re Seablom )*, 45 B.R. 445 (Bankr.D.N.D. 1984), with the following:

The purpose of [§ ]727(a)(4)(A) is to insure that a debtor supplies accurate, complete and dependable information—information that can be relied upon by

---

**13.** By the transfer, then, Mr. McLaren asserts that "Penny McLaren simply returned to [him] what was already his."

**14.** Rule 4005 of the Federal Rules of Bankruptcy Procedure provides as follows:

"At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." Fed.R.Bankr.P. 4005.

anyone having reason to look at the [S]tatement [of Financial Affairs] or [S]chedules. It is possible, and it is oftentimes the case, that the [S]tatement ... or [S]chedules filed with the petition are incomplete for one reason or another without any intent on the part of the debtor for them to be so. It is not the purpose of section 727 to deny a discharge to a debtor merely because information is missing or inaccurate. The information must have been omitted or altered with the specific purpose of working a fraud.

*Id.* at 449; *see In re Craig,* 195 B.R. at 451; *In re Lunday,* 100 B.R. at 508; *Ashton v. Burke (In re Burke),* 83 B.R. 716, 721 (Bankr.D.N.D.1988). In evaluating and weighing these concerns, the first cited by the Court—that of completeness and accuracy in a debtor's disclosure of her ownership interests in property, whatever be their nature—is paramount. In matters such as this, it is of no small consequence that it is the *debtor* who chooses to seek the shelter of bankruptcy. That choice, while freeing the debtor, temporarily at least, from the inconveniences of debt, is accompanied by its own particular demand which, while small indeed, will nonetheless, and at pains, be exacted: that price, at its bare minimum, is the debtor's utmost honesty and candor in all dealings with the Court.

■ It is a "fundamental necessity in bankruptcy" that the information which debtors provide in their petition, Schedules, and Statement of Financial Affairs be accurate, thorough, and reliable. *In re Lunday,* 100 B.R. at 507; *see Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir.1992). In this respect, "[a] debtor has an uncompromising duty to disclose whatever ownership interest he holds in property." *Lunday,* 100 B.R. at 508. The importance of these pronouncements cannot be understated; the bankruptcy system as a whole, and each particular case which forms a component part of it, cannot function without the honest and forthcoming efforts of its debtors. Absent this, the process, and the foundation laid in preparation for a debtor's "fresh start," are destroyed.

■ In order to prevail under § 727(a)(4)(A), the Trustee must establish the following five elements: (1) that the debtor made a statement under oath; (2) that the statement was false; (3) that the debtor knew the statement to be false; (4) that the debtor made the statement with fraudulent intent; and, finally, (5) that the statement related materially to the bankruptcy case. *See Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir.1992); *National Am. Ins. Co. v. Guajardo (In re Guajardo),* 215 B.R. 739, 741 (Bankr.W.D.Ark.1997); *see also Norwest Bank Iowa, N.A. v. Larson (In re Larson),* 136 B.R. 540, 544 (Bankr.D.N.D. 1992) ("To be actionable under [§ ]727(a)(4) the debtor must have knowingly made a false statement under oath with the intent to defraud his creditors regarding matters material to the administration of the estate.").

■ For purposes of this provision, a "false oath" sufficient to merit a denial of discharge includes a misrepresentation or an omission in the debtor's bankruptcy Schedules or Statement of Financial Affairs. *See In re Beaubouef,* 966 F.2d 174 (false oaths sufficient to justify the denial of discharge include a false statement or omission in the debtor's Schedules); *Firstar Bank Iowa, N.A. v. Magnani (In re Magnani),* 223 B.R. 177, 183 (Bankr. N.D.Iowa 1997) (debtor may be denied a discharge for false statements in his Statement of Financial Affairs); *In re Guajardo,* 215 B.R. at 741 (Schedules); *United Mortgage Corp. v. Mathern (In re Mathern),* 137 B.R. 311, 320 (Bankr.D.Minn.) (Schedules), *aff'd,* 141 B.R. 667 (D.Minn. 1992); *McDonough v. Erdman (In re Erdman),* 96 B.R. 978, 985 (Bankr.D.N.D. 1988) (both). In either instance, however, the misrepresentation must be "material," as well as fraudulent, in order to justify the denial. *See* 11 U.S.C. § 727(a)(4)(A); *In re Mathern, supra.*

■ In the first respect, "[t]he subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992) (internal quotation marks omitted, quoting *Palatine Nat'l Bank v. Olson (In re Olson)*, 916 F.2d 481, 484 (8th Cir. 1990)). In the second, "fraudulent intent must be established on the part of the debtor-intent which has been defined as an actual intent to hinder, delay or defraud one's creditors." *In re Burke*, 83 B.R. at 721 (citation and internal quotation marks omitted); *see In re Hogan*, 208 B.R. at 461.

■ "While the intent required must be actual intent as distinguished from constructive intent, it is well settled that such intent may be established by circumstantial evidence with inferences permitted to be made from the debtor's actions." *In re Erdman*, 96 B.R. at 985. The element of actual intent is satisfied where a debtor makes statements with reckless indifference to the truth, for such statements "are regarded as intentionally false." *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr. E.D.Ark.1993); *see March v. Sanders (In re Sanders)*, 128 B.R. 963, 972 (Bankr. W.D.La.1991). In this connection, the existence of multiple falsehoods, taken together with a failure on the part of the debtor to correct all known inconsistencies, omissions, and misstatements upon first amendment, constitutes reckless indifference to the truth and, thus, the requisite intent to deceive. *See, e.g. In re Beaubouef*, 966 F.2d at 178; *Oldendorf v. Buckman*, 173 B.R. 99, 105 (E.D.La.1994). Moreover, the same may apply with equal force where the debtor, in the first instance of filing a petition, Schedules, and Statements of Financial Affairs, makes statements therein, exceeding honest mistake, which are inconsistent and incompatible with her own knowledge and information.

■ In the instant matter, Mrs. McLaren initially signed a voluntary petition, Schedules, and Statement of Financial Affairs, all under penalties of perjury, the "written declarations [of which] have the force and effect of oaths." *In re Smith*, 161 B.R. at 992. Subsequently, she also signed her First and Second Amended Schedules, as well as her Amended Statements of Financial Affairs, under penalties of perjury with the same force and effect.

The subject matter of each of these documents, the information they contain, and the oaths sworn by Mrs. McLaren in their regard, bear a relationship to her estate, and are thus "material." Moreover, a great many of the statements contained within them were made with such a reckless indifference for the truth as to be intentionally false. In this latter respect, not only the original documents, but also their first amendments, are replete with omissions, inaccuracies, and falsehoods. In particular, the record in this case demonstrates false oaths in the Original and Amended Schedules, and Original Statement of Financial Affairs, in the following respects:

1. The omission in Original Schedule A of the extent of Mrs. McLaren's ownership interest in the residence.

2. The assertion in Original Schedule A that the current market value of Mrs. McLaren's interest in the residence, without deducting any secured claim or exemption, amounted to $110,000.00, when in fact the value was approximately $75,000.00, that is, one-half of the appraised value of the residence, a fact of which she was well aware prior to filing her bankruptcy petition.

3. The assertion in First Amended Schedule A that the current market value of Mrs. McLaren's interest in the residence, without deducting any secured claim or exemption, amount-

ed to $84,561.50, when, again, the actual value was approximately $75,000.00.

4. The assertion in First Amended Schedule C that the current market value of Mrs. McLaren's interest in the residence without deducting exemptions was $84,561.50, in light of the above.

5. The assertion in First Amended Schedule D that the market value of the residence was $169,123.00, in light of the above.

6. The assertion in Original Schedule A that the amount of secured claim against the residence was $113,000.00, when in fact the amount was only $89,000.00, a fact of which Mrs. McLaren was intimately aware, having herself applied the proceeds from the sale of her interest in the apartment building—that is, $23,500.00—to pay down her husband's promissory note of $112,500.00. As previously noted, this is also the figure contained in the parties' own Joint Statement of Uncontested Facts.

7. The assertion in First Amended Schedule A that the amount of secured claim against the residence was $89,500.00, in light of the above.

8. The assertion in Second Amended Schedule A that the amount of secured claim against the residence was $89,500.00—an assertion which remains uncorrected in these proceedings—in light of the above

9. The assertion in Original Schedule D that the secured portion of the claim against the residence was $110,000.00, when, in fact, it amounted to $89,000.00.

10. The assertion in First Amended Schedule D that the secured portion of the claim against the residence was $89,500.00, in light of the above.

11. The assertion in Second Amended Schedule D that the secured portion of the claim against the residence was $89,500.00—an assertion which remains uncorrected in these proceedings—in light of the above.

12. The assertion in Original Schedule B that the current market value of Mrs. McLaren's interest in personal property, without deducting any secured claim or exemption, was $5,040.00, when in fact she only possessed a half interest in such property.[15]

13. The assertion in Original Schedule C that the value of Mrs. McLaren's claimed homestead exemption was $1.00, when, in fact, she knew, through her dealings with the Bank in the course of her sale of her interest in the apartment building, and application of the proceeds therefrom, that the value of her homestead exemption was approximately $30,500.00.[16]

14. The assertion in First Amended Schedule C that the value of her claimed homestead exemption was $39,811.50, in light of the above.

15. The assertion in Second Amended Schedule C that the value of her claimed exemption was $30,250.00—an assertion which remains uncorrected in these proceedings—in light of the above.

16. The assertion in the Original Statement of Financial Affairs that Mrs. McLaren's transfer of her interest

---

**15.** The Court also notes that Mrs. McLaren omitted from her Original Schedule B any mention of a tax refund she received in the amount of $1,609.00.

**16.** This value is obtained by: (1) deducting the sale proceeds of $23,500.00 from the $112,500.00 outstanding balance on Mr. McLaren's promissory note, (2) subtracting that amount from the estimated $150,000.00 current market value of the residence, and then (3) dividing that sum in half, for a total of $30,500.00: ($150,000.00 − ($112,500.00—23,500.00)) ÷ 2 = $30,500.00.

in the apartment building to her husband was only of a value of $12,995.89, when, in fact, having held the proceeds check in her own hands, she knew the transfer to have been made for consideration of $23,500.00.

17. The omission in the Original Statement of Financial Affairs that Mrs. McLaren transferred the value of the apartment building transfer, that is, $23,500.00, to the Bank to pay down her husband's promissory note.

At trial, and as a defense, Mrs. McLaren repeatedly ascribed blame for these omissions, inaccuracies, and falsehoods—which, again, she submitted to the Court under penalty of perjury—to her attorney. In this respect, she stated at several points during the trial that she expected him to properly prepare the documents which she signed and filed with the Court, although she readily admitted reading, and signing, the under-penalty-of-perjury declarations, and although she indicated an awareness of her duty to accurately report the information contained within those documents and to carefully review the same before signing and submitting them to the Court.

 The Court previously had occasion to comment on the subject of the presently-asserted defense, in *In re Erdman,* as follows:

> Where a debtor's actions were motivated by attorney advice, that reliance, if reasonable, may excuse acts which otherwise bear indicia of fraud. However, the attorney must have been made fully aware of all relevant facts—that is, the debtor must have made a full and fair disclosure to him. Reliance on attorney advice absolves one of intent only where that reliance was reasonable and where the advice given was informed advice.

96 B.R. at 985. In the instant matter, whatever reliance Mrs. McLaren placed upon her attorney is insufficient to absolve her of the requisite intent under § 727(a)(4)(A). First, the Court is unpersuaded that Attorney Linnerooth was fully, or even substantially, aware of all facts necessary to the accurate preparation of Mrs. McLaren's petition, and various Schedules and Statements. Mrs. McLaren herself provided him with the information which he used to prepare these documents. In particular, the workbook which Mrs. McLaren filled out in her own hand is rife with such inaccuracies as can only be characterized as bald-faced lies. The following constitute a few such examples:

1. Mrs. McLaren answered the question of whether "[she] *or [her] spouse* own or have an ownership interest in any automobiles, trucks, trailers, or other vehicles ...," in the negative. Yet, at trial, Mrs. McLaren testified that her and her husband's household is possessed of *cars,* all of which are titled in Mr. McLaren's name, and of which she herself drives one.

2. Mrs. McLaren answered the questions of whether "any of [her] creditors have liens, mortgages, or other encumbrances against any of [her] property," and whether "any of *[her] spouse's creditors* have liens, mortgages, or other encumbrances against any of his or her property other than those creditors for whom a form was filled out in response to [the former question]," in the negative. Her answers clearly, and at the very least with respect to her husband, ignore the promissory note and mortgage pertaining to the residence.

No testimony was elicited at trial, nor suggestion made, that Attorney Linnerooth advised Mrs. McLaren to lie on the documents which she submitted to the Court. Similarly, nothing was presented at trial, or otherwise, indicating that he advised Mrs. McLaren to submit false information to the Court. The only assertion which Mrs. McLaren made in Attor-

ney Linnerooth's regard was, in essence, that he or his office staff did not fill out the documents with accurate and proper figures and information. Yet, in light of the misinformation with which Mrs. McLaren favored her own attorney, this circumstance could hardly be avoided, and blame for every wanton error, omission, and falsehood contained in the court documents cannot be laid upon him. Thus, the Court can only conclude that the defense raised proves unavailing to Mrs. McLaren.

▪ Here, however, the Court must also pause to emphasize that even had mistakes made originated in Attorney Linnerooth's office—and, again, the Court reiterates its firm conviction that most errors, omissions, and falsehoods in this case originated with Mrs. McLaren, and possibly her husband [17]—this would in no way have absolved Mrs. McLaren from her own duty to personally ensure that the information which she provided the Court, under penalty of perjury, was accurate to the best of her knowledge. Mrs. McLaren herself had an independent obligation to carefully review all of the documentation which she submitted to the Court, and she herself sorely failed in it.

Accordingly, under § 727(a)(4)(A), the record supports the conclusion that Mrs. McLaren, in connection with her bankruptcy case, knowingly and fraudulently made false statements and oaths. Having thus found a sufficient basis for denial of her discharge, the Court now turns to the Trustee's next cause of action.

### 2. Avoidance and Recovery

The Trustee has the discretionary power to avoid and to recover fraudulent transfers pursuant to 11 U.S.C. §§ 548(a) and 550(a), respectively. *Cf. Harstad v. First Am. Bank*, 39 F.3d 898, 901 (8th Cir.1994) (bankruptcy trustee has discretionary power to avoid and to recover preferential transfers pursuant to 11 U.S.C. §§ 547(b)

and 550(a)). In the instant matter, he has exercised his discretion in both respects.

#### i. 11 U.S.C. § 548

##### a. § 548(a)

▪ Section 548(a) is the source of the Trustee's avoidance powers, and provides, in pertinent part, as follows:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A). Under the statute, there are four elements to any fraudulent transfer action: (1) that the debtor has an interest in property; (2) that the debtor has voluntarily or involuntarily transferred this interest; (3) that the transfer occurred on or within one year of the filing of the debtor's bankruptcy petition; and (4) that the transfer was made with the actual intent to hinder, delay, or defraud any entity which was a creditor of the debtor on or after the date of the transfer.

▪ Within this District, this Court has long held that a trustee's burden of proof under the provision is that of clear and convincing evidence, with its last such ruling being *Armstrong v. United Bank (In re Bob's Sea Ray Boats)*, 144 B.R. 451, 458 (Bankr.D.N.D.1992). *See id.; Armstrong v. Pedie (In re Dakota Drilling, Inc.)*, 135 B.R. 878, 886 (Bankr.D.N.D. 1991); *Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 691

---

**17.** Once again, it was Mrs. McLaren's testimony, and the Court does not completely discount her assertion, that her husband assisted her in completing the workbook Linnerooth provided her.

(Bankr.D.N.D.1988); *Reiten Equip., Inc. v. Wightman (In re Wightman)*, 36 B.R. 246, 250–51 (Bankr.D.N.D.1984). More recently, however, application of this standard of proof has, perhaps, been called into doubt by the Eighth Circuit's decision in *Brown v. Third National Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir.1995). In *In re Sherman*, the bankruptcy court determined that various transfers made by the debtors were avoidable under § 548(a)(1), a determination which was subsequently affirmed by the district court. The transferees appealed on the basis that the district court erred in determining that the trustee in that case had proved by a preponderance of the evidence that the debtors acted with the actual intent to hinder, delay or defraud their creditors. The Eighth Circuit, while not directly expressing a preference for application of that standard of proof over that of proof by clear and convincing evidence, did affirm the rulings from both courts, and without finding any error on the part of the district court in applying the proof by a preponderance of the evidence standard to actions under § 548(a)(1). *In re Sherman*, 67 F.3d at 1353–55. However, the imposition of one burden of proof on the Trustee over the other does not alter the outcome in the instant matter; the Trustee prevails under either standard.

■■■■■■ "Although actual intent may be implied from surrounding circumstances, it is the intent of the Debtor as transferor, rather than that of any transferee or third parties[,] that is critical." *In re Bob's Sea Ray Boats*, 144 B.R. at 458; *see Plotkin v. Pomona Valley Imports, Inc. (In re Cohen)*, 199 B.R. 709, 716–17 (9th Cir. BAP 1996). The use of such evidence towards the establishment of fraudulent intent was discussed by the United States Court of Appeals for the Eighth Circuit in *In re Sherman*, as follows:

> Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer. In determining whether the circumstantial evidence established fraudulent intent, courts determine whether any "badges of fraud," which existed under the common law, are present in the transfer. The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, "the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."

67 F.3d at 1354 (citations omitted, quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991)); *see In re Anchorage Marina, Inc.*, 93 B.R. at 691. In this connection, the badges of fraud include whether:

(1) the transfer was made to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer:

(3) the transfer was concealed;

(4) the debtor had been sued or threatened with suit prior to the occurrence of the transfer;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed other assets;

(8) the value of consideration received for the transfer was not reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

*See Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1272 (11th Cir. 1998); *Schieffler v. Beshears (In re Beshears)*, 182 B.R. 235, 239 (Bankr.E.D.Ark. 1995). Further, as the Eighth Circuit re-

cently observed in *National Credit Union Administration Board v. Johnson,* 133 F.3d 1097 (8th Cir.1998):

> Among the more common badges of fraudulent intent at the time of a transfer are: (1) actual or threatened litigation against the debtor; (2) purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention by the debtor of the property involved in the putative transfer.

*Id.* at 1102 (quoting *F.D.I.C. v. Anchor Properties,* 13 F.3d 27, 32 (1st Cir.1994)); *see Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *Armstrong v. Lunday (In re Lunday),* 100 B.R. 502, 507 (Bankr. D.N.D.1989).

■ "Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent." *Kelly,* 141 F.3d at 802; *see Johnson,* 133 F.3d at 1102. The burden then shifts to the transferee to prove "some 'legitimate supervening purpose' for the transfers at issue." *Kelly, supra* (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 806 (9th Cir. 1994)).

At least three of the five badges of fraud articulated in *Johnson* are present in the instant matter, along with several others. First addressing the *Johnson* factors, the transfer of Mrs. McLaren's interest in the apartment building, and that of her sale proceeds, were transfers of substantially all of Mrs. McLaren's non-exempt property, thus leaving nothing from which to satisfy her creditors. Second, at the time of the transfers, Mrs. McLaren was either insolvent or became so shortly thereafter. Moreover, the transfers were admittedly made in anticipation of her bankruptcy filing. Third, the transfers were, respectively, to and on behalf of her husband, an insider.

Next, the transfers did not only occur shortly after a substantial debt was incurred, that is, that which Mr. McLaren incurred by promissory note, but were expressly devised to occur at such time. Finally, Mrs. McLaren initially concealed the transfers in her Original Statement of Financial Affairs in two respects: (1) she failed to fully disclose the value of the initial transfer of her interest to her husband, and (2) she failed to disclose her transfer of the sale proceeds to the Bank in payment towards her husband's promissory note. The confluence of these five badges of fraud entitles the Trustee to a presumption of fraudulent intent on the part of Mrs. McLaren. It thus falls to Mr. McLaren, as transferee, to prove a "legitimate supervening purpose" in justification of the transfers at issue. However, he has not.

In the matter at hand, Mr. McLaren has failed to establish any such "legitimate supervening purpose" to justify the objectionable transfers. Indeed, for their utterly shameless subversion of the bankruptcy process, his and Mrs. McLaren's collusive efforts establish just the opposite. This Court neither doubts nor questions what would have been the propriety of Mrs. McLaren's merely converting a reasonable amount of non-exempt assets into exempt assets, even on the eve of bankruptcy, for the Eighth Circuit has spoken on, and allowed, this very thing. However, such efforts have been, and have necessarily been understood to be, for *the benefit of the debtor* per the policy concerns of the Code. Thus, it is antithetical, and does violence, to the very spirit and body of the Code, as well as to the legislative process from which it was born, that such claim exemption should be permitted to *pauperize* a debtor—even where she is a willing and compliant participant to her own undoing—rather than to *improve or elevate* her position. Yet, this is precisely the situation with which the Court is now confronted.

In the instant matter, Mrs. McLaren did not avail herself of a just right of exemption, but rather, actively and willingly partook of a course of conduct by which she abandoned assets to her husband at a great loss to the bankruptcy estate—and through it, her creditors—as well as to herself. The situation becomes apparent by contrasting and juxtaposing Mrs. McLaren's pre- and post-transfer financial positions. Prior to the sale of her interest in the apartment building, Mrs. McLaren was possessed of a valuable interest in that real property of at least $23,500.00; of an equity interest in her residence, as well as claim of homestead exemption, in the amount of $37,771.50 [18]; and various inconsequential amounts of personal property. Further, there remained only $74,457.00 outstanding on the McLaren's home loan. After the sale, however, Mrs. McLaren no longer retained any interest in the apartment building and, incredibly, experienced a *decline* in both her home equity and claim of homestead exemption, that is, from $37,771.50, as previously noted, to $30,500.00.[19] The impact of the fraudulent transfers of Mrs. McLaren's interest in the apartment building and of her sale proceeds in the amount of $23,500.00, damaged Mrs. McLaren's net overall position by at total of $30,771.50.

Finally, the McLarens would have this Court believe them to be innocents blindly following, and victimized by, the illegitimate and ill-conceived advice of counsel. Yet, nothing in either their background, or demeanor at trial, permits such a finding. Both of the McLarens have a great deal more than a modicum of financial expertise: Mr. McLaren in managing their apartment business, and Mrs. McLaren in her years' of accounting experience in the workforce. Moreover, both of the McLarens showed themselves to be extremely concerned with wresting Mrs. McLaren's only non-exempt asset from her creditors, through the estate, by whatever means were available to them. This Court is not of the belief that the McLarens' actions were motivated by attorney advice, rather, and to the contrary, the Court believes the McLarens' to have been wholly motivated by their own fraudulent inclinations.

Clever though their machinations may have been, their full import and their abounding and unmistakable indicia of fraud, have not, as noted, escaped the Court's attention. This Court will not permit the processes of bankruptcy to be cooped and harnessed for fraudulent use. Accordingly, and absent a contrary determination under the shelter provision of 11 U.S.C. § 548(c), the Court shall allow the Trustee to avoid the transfers here at issue.

### b. § 548(c)

 Even a transfer found to be fraudulent under § 548(a) may, at times, prove unrecoverable from the transferee, for § 548(c) "provides that a fraudulent transfer is not recoverable when the transferee received the transfer for value and in good faith." *Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 693 (Bankr.D.N.D.1988); *see* 11 U.S.C. § 548(c).[20] However, as § 548(c) protects

---

**18.** The Court arrives at this figure by subtracting the amount then-outstanding on the first home loan from the appraised value of the residence and dividing that amount by two: ($150,000.00 − $74,457.00) ÷ 2 = $37,771.50.

**19.** The Court arrives at this figure by reducing the amount of the promissory note—which is secured by the jointly executed mortgage—by the amount of Mrs. McLaren's sale proceeds; subtracting this amount from the appraised value of the home; and dividing that figure by two: ($150,000.00 − ($112,500 − $23,500.00)) ÷ 2 = $30,500.00.

**20.** The statute provides, in pertinent part, as follows:

> [A] transferee or obligee of ... a transfer or obligation [voidable under this section] that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

only *good faith* purchasers for value from a trustee's reach under § 548(a), it is of no avail here.

 The burden of proving each element under the statute falls squarely on the transferee. *See Langhorne v. Warmus (In re Am. Way Serv. Corp.)*, 229 B.R. 496, 525 (Bankr.S.D.Fla.1999); 5 *Collier on Bankruptcy* ¶ 548.10, at 548–81 (Lawrence P. King, ed., 15th ed. rev.1999). "Good faith" is an "indispensable element," and predicate, of this shelter provision. *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir.1983); *see Hayes v. Palm Seedlings Partners (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir.1990); *Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 733 (Bankr.D.Mass.1996). Although the requirement is insusceptible to precise definition,[21] a finding of actual fraud under § 548(a)(1)(A), as was had in the instant matter, precludes the transferee from recovering any value given pursuant to § 548(c). *See In re Roco Corp., supra; see also In re Terrific Seafoods, Inc., supra* (good faith is not susceptible to precise definition). Additionally, the Court notes that a more searching analysis under the requirement, as enunciated in case authority, here produces an identical result.

In *Brown v. Third National Bank (In re Sherman)*, 67 F.3d 1348 (8th Cir.1995), the Eighth Circuit offered the following guidance towards making determinations of "good faith":

> To determine whether a transferee acts in good faith, "courts look to what the transferee objectively 'knew or should have known'" instead of examining the transferee's actual knowledge from a subjective standpoint. *In re Agricultural Research & Technology Group, Inc.*, 916 F.2d 528, 535–36 (9th Cir.1990); *cf. Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 897–98 (7th Cir.

11 U.S.C. § 548(c).

**21.** "Good faith" is neither defined in the Code nor the legislative history to § 548(c). *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84

1988) (analyzing good faith under § 550(b)). In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency. *In re Anchorage Marina, Inc.*, 93 B.R. 686, 693 (Bankr.D.N.D. 1988); *see also* 4 *Collier*, at 548–72 to – 73. In a related context to determine whether good faith exists, the court looks to whether "the transaction carries the earmarks of an arms-length bargain." *In re Robbins*, 91 B.R. 879, 886 (Bankr.W.D.Mo.1988) (internal quotation and citations omitted) (analyzing good faith under § 549(c)).

*Id.* at 1355; *accord Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1335 (10th Cir.), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996). In light of this Court's findings of fact regarding Mr. McLaren's knowledge of his wife's impending bankruptcy and simultaneous instigation of, and participation in, the transfers which this Court concluded to be wholly fraudulent in nature, it is abundantly clear under the *Sherman* factors that Mr. McLaren was utterly lacking in the good faith necessary to successfully invoke the shelter of § 548(c). Accordingly, the Court will allow the Trustee **to avoid the transfers of Mrs. McLaren's interest in the apartment building to her husband** and of her sale proceeds to the Bank, both of which are of a piece and are valued at $23,500.00.

### ii. 11 U.S.C. § 550

 "It is by virtue of [§ ] 550(a) and [§ ]541(a)(3) that interests in property successfully recovered by the trustee are brought back into the estate. Section 541(a)(3) provides that an estate is comprised of any interest in property that the trustee recovers under [§ ] 550." *Westphal v. Norwest Bank (In re Mo. River*

F.3d 1330, 1335 (10th Cir.), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996).

*Sand & Gravel, Inc.)*, 88 B.R. 1006, 1012 (Bankr.D.N.D.1988). In turn, § 550 "determines from whom the trustee may recover property whose transfer has been avoided pursuant to § 548," *Brown v. Third National Bank (In re Sherman)*, 67 F.3d 1348, 1356 (8th Cir.1995), and further, in what form. In pertinent part, § 550(a)(1) provides, as follows:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under ... 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]

11 U.S.C. § 550(a)(1). Thus, the section "expressly provides the trustee may recover either the property transferred *or its value.*" *Halverson v. Le Sueur State Bank (In re Willaert)*, 944 F.2d 463, 464 (8th Cir.1991) (emphasis added). Moreover, "[t]he recovery to be allowed is *wholly within the discretion of the court.*" *Armstrong v. Vedaa (In re Vedaa)*, 49 B.R. 409, 411 (Bankr.D.N.D.1985) (emphasis added); *see also In re Willaert, supra* (citing same); *Davis v. Davenport (In re Davenport)*, 147 B.R. 172, 184 (Bankr. E.D.Mo.1992) ("A court applying Section 550 may exercise discretion in choosing whether to order the return of the property involved in the avoidable transfer to the estate or to enter a monetary judgment for the value of the transferred property against the parties on whom the section imposes liability.").

▪ Having previously found that Mr. McLaren is not a good faith transferee, the Court concludes that the exception contained within § 550(e) is inapplicable to the matter at hand.[22] Accordingly, as remedy in the instant matter, this Court shall grant the entry of a money judgment in the Trustee's favor against Mr. and Mrs. McLaren, jointly and severally, in the amount of $23,500.00, together with legal interest, and secured by a lien in the McLarens' residence superior to their interest in the same.

## III. CONCLUSION

Accordingly, and for the foregoing reasons, IT IS ORDERED THAT Debtor–Defendant Penny Lee McLaren is DENIED a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(4)(A). IT IS FURTHER ORDERED THAT the transfer to Penny Lee McLaren of $23,500.00 (represented by check number 1002) and its subsequent conveyance to State Bank of Fargo, is deemed to be a fraudulent transfer and is avoided pursuant to 11 U.S.C. § 548(a)(1)(A); that the Trustee, Kip M. Kaler, is hereby GRANTED as recovery for the estate, pursuant to 11 U.S.C. §§ 541(a)(3) and 550(a)(1), judgment in his favor and against Defendants Kirby D. and Penny Lee McLaren, jointly and severally, in the amount of $23,500.00, together with legal interest, and secured by a lien superior to their own interest in the following described real property: 1919 19th Street South, Fargo, North Dakota 58103, particularly described as the South Fifty–Seven Feet of Lot Eleven and the North Twenty–Three Feet of Lot Twelve, in Block Eleven, of Southview Villages Addition to the City of Fargo, Situated in the County of Cass and the State of North Dakota. The Trustee's request for costs and disbursements incurred in pursuit of this action is DENIED.

---

**22.** Section 550(e) provides as follows:

> (1) A good faith transferee from whom the trustee may recover under subsection (a) of this section has a lien on the property recovered to secure the lesser of—
>
> (A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and
>
> (B) any increase in the value of such property as a result of such improvement, of the property transferred.

11 U.S.C. § 550(e)(1).

JUDGMENT MAY BE ENTERED ACCORDINGLY.

SO ORDERED.