In re HONEY CREEK ENTERTAIN-
MENT, INC. d/b/a Arbuckle Wil-
derness, Debtor.

Kenneth G.M. Mather, Chapter
11 Trustee, Plaintiff,

v.

Lena Clancy, et al., Defendants.

Bankruptcy No. 97–71626.
Adversary No. 99–7079.

United States Bankruptcy Court,
E.D. Oklahoma.

March 23, 2000.

Kenneth G.M. Mather, Tulsa, OK, for plaintiff.

Dan Little and Stephen Oliver, Madill, OK, Betty O. Williams, Muskogee, OK, for defendants.

## *OPINION*

TOM R. CORNISH, Bankruptcy Judge.

This adversary proceeding came on for trial on the merits pursuant to the Pre–Trial Order entered in this case. Kenneth G.M. Mather appeared for the Plaintiff and Dan Little, Betty Outhier Williams and Stephen Oliver appeared for the Defendants, Lena Clancy, J. Michael Clancy, Trent Capital Company, Deer Run Lodge, Acme Finance, ARRC Partnership, and Arbuckle Development Company, L.L.C. Testimony was heard by the Court on three different dates. This Court has jurisdiction over the parties and the subject matter in this core proceeding under the authority of 28 U.S.C. § 157(b) and § 1334(b). The Trustee is attempting to avoid various and sundry pre-petition and post-petition transfers made by the Defendants under §§ 544, 547, 548, 549 and 550 of Title 11 of the United States Code. The Trustee also seeks relief against the Defendants under the Oklahoma Uniform Fraudulent Transfer Act. There is also a cause of action brought by the Trustee on debts owed by Lena Clancy and Acme Finance to the bankruptcy estate. Lena Clancy has also been sued for alleged acts of her breach of fiduciary duty while acting as the person in control of the business enterprise while a debtor-in-possession.

The Debtor will be referred to as "Honey Creek;" Lena Clancy will be referred to as "Lena;" J. Michael Clancy will be referred to as "Mike;" and the various Defendants that are business entities will be referred to collectively as the "Clancy Defendants" or by specific names. The Court has been advised that Defendants, Gerald D. Hagee, Bobby G. Smith and Polly M. Hagee, not insiders of Honey Creek, have previously entered into an agreement with the Trustee wherein the claims against them are to be held in abeyance until resolution of this particular adversary proceeding.

This case is factually intensive and will require an exhaustive recitation of facts in order to give a clear meaning to this complicated scenario of events. Honey Creek was incorporated and took over the business of operating the Arbuckle Wilderness Animal Theme Park in Davis, Oklahoma around October of 1994. The Park had been operated for years by the Hagee family. Approximately two years before

Honey Creek acquired the Park, it was being operated by the Murray County Industrial Authority ("MCIA"). Mr. Ron Armitage was in charge of this asset of MCIA.

The First National Bank in Durant loaned Honey Creek $2,250,000 in October of 1994. The owners of Honey Creek and its officers and directors were Ron Armitage, Jim Ranier and Lena Clancy. At the time of the loan closing, $250,000 of the loan proceeds was used to pay off loans owed by Lena and/or her related entities to the Bank. There was also executed by Ron Armitage, Jim Ranier and Lena Clancy on behalf of Honey Creek, and by Lena Clancy and Mike Clancy on behalf of Deer Run Lodge, a Memorandum of Understanding that Honey Creek was to distribute some $200,000 to Deer Run Lodge, a ranch and lodge owned by Lena in Bryan and Atoka Counties which comprised approximately 2,000 acres with cabins and a lodge. The $200,000 was never paid by Honey Creek to Deer Run Lodge.

At approximately the same time as the closing with First National Bank of Durant, a Promissory Note was executed in the amount of $534,930 from Honey Creek, by its President, Ron Armitage, to Gerald Hagee and Bobby Smith for the purchase of a tract of land across from the Park. On the same day, there was another Promissory Note of $39,000 and a Promissory Note of $68,475 payable by Honey Creek to Gerald Hagee only, for other real property near Honey Creek. Honey Creek also executed a Mortgage to secure these transactions.

This transaction was ultimately reversed or, in other words, the land was transferred back to Hagee and Smith. This occurred in June, 1997. This transfer is also part and parcel of the Trustee's action to recover damages against the Defendants.

Lena, Ron Armitage and Jim Ranier each owned 30% of the common stock of Honey Creek. All were officers and directors of Honey Creek, with Ron Armitage in charge of the day to day management and operation of the Park. Jim Ranier was also employed at the Park and worked with Armitage. Lena and her son, Mike, took over the daily operations of the Park in January, 1997 when they determined that the Park was being mismanaged. Lena purchased Armitage's stock for $20,000 and his employment was terminated. Lena oversaw the operation but was not necessarily the day to day hands-on person. Mike was the manager of the Park. According to Lena, at the time she and Mike took over operations, the payroll was due and there were numerous delinquent accounts that Armitage had failed to pay which put the Park in desperate financial straights. She testified that she and Mike were able to keep the Park in operation, and not incur any additional debt over and above what Armitage had incurred, until sometime in June, 1997 when it became apparent that the Park could not meet its obligations. Through consultations with its attorney, Robert Inglish, Honey Creek filed its Chapter 11 reorganization on July 1, 1997. Lena and Mike operated the Park from January 23, 1997 until February 11, 1999 when Ken Mather was appointed the Chapter 11 Trustee and took over the operation of the Park.

## FINDINGS OF FACT

1. The Court finds that Honey Creek lost substantial sums of money while Mr. Armitage was its operating officer. The Park was in financial distress when Lena and Mike took it over in January of 1997. Lena caused corporate tax returns to be filed for the Park by Mr. Rex Williams, CPA. Mr. Armitage failed to file any corporate tax returns. Although Lena was a 30 percent stock owner and a director of Honey Creek, the Court finds that she had the ability and numerous opportunities to investigate and possibly remove Mr. Armitage prior to the time that she and Mike actually terminated him. In other words,

some of the damages caused by Armitage's mismanagement might have been stopped at a much earlier date.

2. Four tax returns reflect a loan or debt owed by Lena to Honey Creek. This debt in the amount of $296,387 came partially from the loan proceeds from the First National Bank in Durant ("FNB"). The Court finds that this debt owed by Lena to Honey Creek has never been paid or forgiven.

3. Lena has a bachelor's degree and a master's degree and is licensed as a Certified Financial Planner. The Court finds that Lena is a very smart and sophisticated business woman. She is also delightful and quite charming. Although she does not appear to have had many financial successes, over the years she has consulted and has been advised by many fine Oklahoma attorneys and certified public accountants. She has organized, promoted and operated several entities, including but not limited to Honey Creek, Trent Capital Company, Deer Run Lodge, Acme Finance, ARRC Partnership and Arbuckle Development Company, L.L.C. She is also no stranger to litigation. She was involved in some contentious family litigation involving her mother's estate with various family members. She also is presently involved in litigation with the Sulphur Bank. She recently was successful in suing the FNB, the bank which made the Honey Creek loan, wherein she obtained a judgment in excess of $1,000,000 against the Bank and was further found to be not liable on her personal guaranty of the Honey Creek loan. Even though Lena would have the Court believe otherwise, the Court finds that Lena is a very sophisticated business person.

4. The Court will now address the Hagee land deal. As previously mentioned, Honey Creek purchased and mortgaged this land to Hagee and Smith at the time Honey Creek obtained the loan from the Durant Bank. While Armitage was running Honey Creek, he did make several payments on the Hagee note and mortgage.

The Promissory Note provided for quarterly payments, the first eight of which would consist of principal only. After the first eight payments, the principal and interest would be amortized over 13 years. After Lena and Mike took over the operation of Honey Creek from Armitage, something quite strange occurred. Honey Creek conveyed all its interest in the Hagee land back to the original grantors, Hagee and Smith, in June, 1997. Thereafter, some nine days before the filing of bankruptcy, specifically on June 21, 1997, Gerald Hagee and his wife, Polly, along with Bobby Smith, while waiving homestead rights, transferred all of their interest in the Hagee land to Arbuckle Development. These deeds were actually filed on June 30, 1997, the day before the bankruptcy was filed.

The Court finds that Arbuckle Development is a company wholly owned by Lena and Mike Clancy. It is interesting to note from the bankruptcy schedules that the transfer by Honey Creek to Hagee and Smith was disclosed in the bankruptcy papers. Interestingly, the transfer by Hagee and Smith to Arbuckle Development was never disclosed to anyone until this litigation commenced. The Trustee is claiming the estate has been damaged in the amount of $100,000 by reason of these transfers. Evidence was presented regarding payments made to Hagee which were three checks all dated December 23, 1996 in the following amounts: $12,582.78; $1,662.70 and $990.32. However, these checks were marked "Stop Payment." There were two checks admitted into evidence from Lena's personal account on January 28, 1997 in the amount of $15,-235.80 and one dated May 14, 1997 in the amount of $10,000 to Jerry Hagee. The notation on the January 28, 1997 check was for November payment on "Honey Creek deal" and on the May 14, 1997 check was "loan-Feb. 1997 Arbuckle Land Payment." There was also a check dated May 13, 1997 to Jerry Hagee in the amount of $7,557. However, at the trial, the uncon-

tradicted testimony of Don Yeager, Certified Appraiser, found that the highest and best use of the property is for agriculture purposes and that its current fair market value as of November 19, 1999 is $197,600. Mr. Yeager admitted he did no investigation of the value of the property as of July 1, 1997.

Even though these property transfers appear to be clandestine and highly suspicious, the Court cannot find by any credible evidence that the estate has been damaged by these land transfers. What has happened in the Hagee land transactions is that the Honey Creek incorporators really thought that Reba McIntyre would probably lend her name and resources to a theme park across the road from the animal park and that the Hagee land could be sold and developed at a substantial profit. This just never occurred. It was a pipe dream at best.

5. The Court will now address the Pauline Bailey problem. The Trustee seeks recovery from Lena only for the Honey Creek payment to Pauline Bailey in the amount of $31,315.24 dated June 30, 1997. At the trial, Lena and her attorneys conceded that the Trustee could recover judgment in this amount and thus, the Trustee's claim in this cause of action is granted. However, a more thorough discussion of the Pauline Bailey problem is necessary to set the stage for other things that occurred in this case.

Pauline Bailey is a 93 year old lady who lives in McCurtain County, Oklahoma. Lena has been friends with Pauline and her family for many years. Lena has acted as a financial advisor for Pauline for several years and has purchased stocks and securities on her behalf. However, Lena induced Pauline to invest in ARRC, a partnership consisting of Lena, Ron Armitage, Jim Ranier and Mr. Richeson, which owned several ostriches. These ostriches resided at the Park. Lena testified that presently there are no assets in the ARRC Partnership. The check paid by Honey Creek to Pauline Bailey for $31,315.24 rep-

resented a repayment on the loan that was owed by the ARRC Partnership. There was never a debtor/creditor relationship between Pauline Bailey and Honey Creek. The Debtor, Honey Creek, obviously received no benefit from this pre-petition transfer. Diane Mason, Pauline Bailey's daughter, testified that Lena still owed her mother approximately $60,550 at this time. The present loan balance of $60,550 is on an original loan of $50,000, the maker of that note being Bob Richeson of ARRC. The last time the note was renewed, there was an interest only payment of $6,000 paid to Pauline by a personal check from Lena.

On April 16, 1999, on Lena's financial consultant letterhead, she wrote to Pauline Bailey and advised Pauline that Lena had just found out that Pauline was on the Trustee's Witness List for trial. The letter stated in part: "I am hoping you are away from home on a trip or at one of your family's homes. If you have not accepted the certified letters, do not sign for them. I have called you today several times,— that is why I am writing to you. You can get a doctor's statement saying you cannot go to Okmulgee, it's totally absurd anyway. I will keep trying to get ahold of you by phone. I love you, my dear friend. Lena. Please destroy this after you read it." The Court finds that Lena took all available measures to discourage Pauline Bailey from participating in these judicial proceedings. The Court finds, based on Lena's concession, that the Trustee may recover $31,315.24 from Lena on the Pauline Bailey payment from Honey Creek funds.

6. The Court will now address the $450,000 Promissory Note from Lena payable to Honey Creek. At the time of the $2,250,000 loan with Durant Bank, $250,000 of the loan proceeds went to Lena for the payment of the Acme loan with Durant Bank which was in the approximate amount of $250,000. At the time of that loan, Lena testified that she was the sole owner of Acme. There were some transfers

of ownership recently where she transferred some interest in Acme to her son and daughter. Even though Lena did not keep the $250,000, it benefitted her by paying off the Acme loan. It is undisputed that the other $200,000 which Lena agreed to repay Honey Creek was never funded. In other words, she only received a benefit of $250,000 from this note. However, this transaction does not involve a straight forward deal.

In Lena's sworn testimony on December 8, 1999, she stated that she *did* sign the note, but that the note would only have to be repaid from any future dividends declared to her from Honey Creek. Her interpretation of the note was that if no dividends would be paid, then she would never have to pay on the note. Lena also had another version of the legal effect of the note. In a Promissory Note dated October 10, 1994, there is a provision that "payment shall be made solely from dividends payable to the maker from Honey Creek Entertainment Corp." This note is signed by Lena Lee Clancy, and she stated that it was her signature on the note. Sometime around April 1, 1995, another Promissory Note in the amount of $450,000 dated October 11, 1994 and signed by Lena Clancy was "voided" by Lena "due to total amount loan" in that she struck through the $450,000 and replaced it with $250,000. Lena testified this was done because she only received $250,000 in loan proceeds. Honey Creek was represented by an attorney in Oklahoma City, Greg Eddington, and Lena was represented by Mr. Windel, during negotiations and preparation of this note.

What is perplexing and suspicious to the Court is that when the trial was reconvened on December 28, 1999, Lena testified under oath that this was *not* her signature on the note and that she never signed the note. This puts the Court in the difficult position of trying to reconcile two inconsistent stories given by Lena under oath. Which story, if any, can the Court now believe and give credence to?

U.S. corporate income tax returns were filed by Honey Creek for 1994, 1995, 1996 and 1997. Lena testified that she caused these returns to be filed and signed the returns under oath as its President. The 1994 return was prepared by Wilsey Meyer & Co., P.C. of Oklahoma City and the 1995, 1996 and 1997 returns were prepared by Rex Williams, of Williams Company, CPAs, Inc. of Durant, Oklahoma. The 1994 federal tax return reflects a note receivable from stockholder in the amount of $296,387. The 1995 federal tax return reflects on Schedule L "Other Assets" a beginning balance of $296,386 and ending balance of $295,837. The 1996 federal tax return reflects a beginning balance in "Other Assets" of $295,837 and an ending balance of $296,827. The 1997 federal return reflects on Schedule L a beginning balance of $296,827 and the same ending balance. It appears this is the note owed by Lena which is carried on the books. Rex Williams did not testify at the trial, and Lena testified that no amendments had been filed for any of the corporate tax returns.

Steve Rutherford, a CPA, testified for the Trustee. He reviewed the corporate tax returns and testified that the $296,387 loan from Honey Creek to Lena was carried through all the tax returns and schedules. He further testified the tax returns reflected that there had never been any repayments on the loan. Mr. Rutherford testified that from the 1996 tax return, it appeared that Honey Creek was insolvent.

By agreement of the parties, the telephonic deposition of Greg Eddington was introduced at the trial. Mr. Eddington was Honey Creek's attorney during negotiations and preparation of the Promissory Notes. His deposition was taken on December 22, 1999. Mr. Eddington found two notes in his Clancy file in his garage. One note is dated October 10, 1994 in the amount of $450,000 and signed by Lena. The other note, of the same date and the same amount, "looks like a conformed copy." He states that the promissory note

was prepared by attorney Lynn Windel. Mr. Eddington thought that Mr. Windel was representing Lena and was involved in advising her on the personal guaranty. Mr. Eddington said he was aware of the provision that the loan was to be paid from dividends and that the note was drafted so that there would be a real obligation from Lena to the corporation. Mr. Eddington does not believe the October 11, 1994 note was prepared by him. He does not know for sure on whose computer the October 10, 1994 note was prepared.

7. The Trustee is seeking to recover pre-petition transfers, which involve certain checks written by Honey Creek out of the Honey Creek operating account as follows:

(a) Payment to Mike Clancy of $11,900, dated April 5, 1997;

(b) Payment to Mike Clancy of $7,820.84 dated June 30, 1997;

(c) Payment to Lena Clancy of $30,-313.74 dated June 30, 1997;

(d) Payment to Murray County Clerk of $96 dated June 30, 1997;

(e) Payment to Murray County Treasurer of $1,695.63 dated June 30, 1997; and

(f) Payment to Jerry Hagee of $7,557 dated May 13, 1997.

The check to Mike Clancy dated June 30, 1997 was not disclosed in the Debtor's bankruptcy schedules. Paul Thomas, Attorney Advisor in the office of the United States Trustee, testified this, as well as other pre-petition payments, should have been disclosed in the bankruptcy schedules. Lena testified that the payment to Mike in June, 1997 was for wages. Lena further testified that Mike needed to be paid and had no independent wealth. Lena attempted to explain that the April 5, 1997 check to Mike just went from one Arbuckle operating account to another and Mike received no money from the check. However, her testimony was the only evidence presented. The April 5, 1997 check was drawn on an account titled "Bob Richeson dba AWEAP." The check was

written to Mike Clancy and signed by Mike Clancy. Paul Thomas testified that even if this check was deposited into the Debtor's payroll account, a problem still exists because this transaction was not disclosed.

The check to Lena in the amount of $30,313.74 dated June 30, 1997 was purportedly for a partial reimbursement of expenses. Lena testified she either received cash from this check or deposited it into her checking account. While testifying, Lena admitted that the $96 check to the Murray County Clerk dated June 30, 1997 should have been paid from her personal funds. Likewise, she admitted $594.12 of the $1,695.63 check to the Murray County Treasurer dated June 30, 1997 should have been paid from her personal funds. Lena explained the check to Jerry Hagee dated May 13, 1997 in the amount of $7,557 was a partial payment on the February payment on the Hagee property.

8. On July 27, 1998, a Honey Creek check was issued by Lena Clancy to her corporation, Acme Finance Company, in the amount of $20,000. Supposedly, this was for the purchase of two tractors. No approval was obtained for the purchase of these tractors by the Court. Lena testified one of the tractors was a 1992 model tractor and the other tractor was older, but in good condition. One tractor she believed she purchased new for $17,000 and one was purchased used. No evidence regarding the purchase price was presented. Lena conveniently did not remember if a Bill of Sale was given to Honey Creek. It is interesting to note that these tractors had been removed prior to the Trustee taking over the Park in February, 1999. Mike testified the tractors were returned after the Park had been sold but were not returned to the Trustee. Paul Thomas testified that Court approval should have been obtained prior to the purchase of these tractors.

9. On September 1, 1998, a check was issued by Mike Clancy from Honey Creek's Zurich account in the amount of

$33,000 to Acme Finance Company. The memo portion of the check reflects the check is for a loan. The Defendants produced a document entitled "Equipment Lease" for a term of six months from September 1, 1998 to February 28, 1999 for a total payment of $19,654. This was for the lease of both small and large equipment as well as kitchen equipment. Mike testified that this document was prepared to justify a portion of the $33,000. He began preparing the lease in the fall of 1998 but it was not completed until January, 1999. The equipment had been removed from Deer Run Lodge to the Park for approximately one year prior to putting this lease together. To further justify this $33,000 check, the Defendants offered an Invoice from Acme Finance to Arbuckle Wilderness dated September 1, 1998 for dozer rental and 50 hours of excavation and dirt work in the amount of $13,800. Again, Mike testified that this Invoice was not prepared in its entirety until January, 1999. The total amount of the equipment lease and dozer invoice was $33,454. However, Lena was generous enough to forgive the $454. Mike admitted this transaction should have been disclosed. A lease termination agreement was entered on February 8, 1999 to cancel a lease between Arbuckle Wilderness and Acme effective February 1, 1999. Mike believed his mother created this lease termination agreement.

It appears there may have been a written lease between Arbuckle Wilderness and Mike Clancy for the lease of his 1998 Dodge one-ton pickup. No evidence of the written lease was presented, but a letter dated February 8, 1999 terminating this lease dated July 1, 1998 was presented into evidence. Mike testified Court approval was not obtained prior to this lease being entered.

10. Wendell Woodroff, an employee of Arbuckle Wilderness took equipment belonging to Acme Finance to Southwest Auction Company in Hallet, Texas on February 9, 1999. Arbuckle Wilderness was not reimbursed for the expenses of using its employee for Acme's benefit. Additionally, Mike testified that Debtor's employees were used on the Hagee land. He believed the Debtor benefited in an indirect way; i.e., materials from the Hagee land were used on a house used by Debtor's employees. Mike estimated that employees were used for 30 hours of work on the Hagee land.

11. Trent Capital filed a proof of claim with three promissory notes attached: one note dated October 12, 1995 in the amount of $60,000 between Honey Creek and Trent Capital; another note dated January 12, 1995 in the amount of $30,000 between ARRC and Trent Capital; and a $50,000 note between Lena and Honey Creek dated April 10, 1995. Ron Armitage testified that he did not sign any of these notes and further, that the notary signature was not that of Sheila McClure, his Administrative Assistant for approximately seven years. Lena testified that the proceeds of these loans went into the Debtor's operations, regardless of the parties who executed the notes. The check which evidences the note between Lena and Honey Creek in the amount of $50,000 was paid from a checking account in the name of Edith Trent.

12. Although the Debtor's schedules reflect that its assets exceed its debt, the Court finds that the Debtor was insolvent at the time the bankruptcy was filed. Ron Armitage testified that when he resigned, it would have been questionable if the assets exceeded the debts. He further testified at that time, the Bank debt was being paid but other vendors were not. The trade debts at that time were in excess of $200,000. The Debtor was in need of a capital infusion. He thought some creditors might work with them, but it was no secret they were having trouble. Steve Rutherford reviewed the financial documents of the Debtor and according to the 1996 tax return, the Debtor's debt exceeded its assets. Furthermore, the Debtor had a negative cash flow. Lena testified

that from January, 1997 to June, 1997, the Debtor had accumulated a cash surplus; however, trade debts prior to her taking over the Debtor had not been paid.

13. All Defendants except Gerald D. Hagee, Polly M. Hagee and Bobby G. Smith are insiders of the Debtor.

14. The Court will next deal with the use by Lena and Mike of their personal credit cards, some ten (10) credit cards, more or less, which were used to purchase goods and services for the Park. They were also used personally by the Clancys during the bankruptcy. They argue that since the credit cards were paid in a timely manner each month, and the Clancys reimbursed the Debtor for their personal purchases, this was proper and necessary since it was the only way they could obtain necessary goods for the Park. Debtor's attorney testified he would have advised the Clancys it was all right to use credit cards as long as they were paid on time. The Court finds that the Debtor never obtained court approval for the extension of credit via the personal credit cards. The Court heard no evidence that either Mike or Lena failed to reimburse the Debtor for any personal items charged to the personal credit cards.

## CONCLUSIONS OF LAW

### A. TRUSTEE'S FIRST CAUSE OF ACTION

█ The Trustee seeks a determination that Lena owes a debt to the Debtor in the amount of $296,827. The Court agrees with the Trustee and finds that a debt is owed by Lena to the Debtor in such amount. The Court does not believe Lena's testimony with regard to the note is credible. Specifically, Lena's sworn testimony is contradictory. She first testified that she signed the note which provided that the loan would be repaid from future dividends. When the trial reconvened, she testified she never signed the note. The Court finds the tax returns to be the most reliable evidence and therefore finds a

debt exists by Lena in favor of the Debtor. The Court finds that payment was not contingent upon dividends received by Lena from the Debtor. Thus, the Trustee must prevail on this cause of action.

### B. TRUSTEE'S SECOND CAUSE OF ACTION

On October 10, 1994, Honey Creek obtained additional land, across the road from the Park, from Hagee and Smith. Honey Creek executed a mortgage and security agreement. The debt was in the amount of $642,405. The statement of financial affairs reflects that 500 acres were transferred to Jerry Hagee in June, 1997, with the approximate value of $590,000. Thereafter, on June 21, 1997, Hagee and Smith transferred the Hagee land to Arbuckle Development. On June 30, 1997, on the eve of bankruptcy, Arbuckle Development executed a mortgage and security agreement in favor of Hagee and Smith. This second transfer from Hagee and Smith to Arbuckle Development was not disclosed in the Debtor's statement of financial affairs.

The Trustee seeks to avoid the transfer of the Hagee land as a preferential transfer pursuant to 11 U.S.C. § 547 or as a fraudulent transfer pursuant to §§ 548, 544 and the Uniform Fraudulent Transfer Act as adopted by Oklahoma. The Trustee seeks recovery from Arbuckle Development pursuant to 11 U.S.C. § 550.

The Trustee may avoid fraudulent transfers pursuant to 11 U.S.C. § 548, which provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or

after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The four elements required under § 548(a)(1) are: (1) that the debtor has an interest in property; (2) that the debtor has voluntarily or involuntarily transferred this interest; (3) that the transfer occurred on or within one year of the filing of the debtor's bankruptcy; and (4) that the transfer was made with the actual intent to hinder, delay, or defraud any entity which was a creditor of the debtor on or after the date of the transfer. *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 899 (Bankr.D.N.D.1999) (citations omitted). The focus of § 548(a)(1) is on the intent of the debtor. *Id.* Courts may infer fraudulent intent from the circumstances surrounding the transfer. *Id.; see also Nordberg v. Republic Nat'l Bank of Miami (In re Chase & Sanborn Corp.)*, 51 B.R. 739, 740 (Bankr.S.D.Fla.1985). Courts have looked at the following factors or "badges of fraud":

(1) the transfer was made to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was concealed;

(4) the debtor had been sued or threatened with suit prior to the occurrence of the transfer;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed other assets;

(8) the value of consideration received for the transfer was not reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred.

*McLaren,* 236 B.R. at 899 (citing *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1272 (11th Cir.1998); *Schieffler v. Beshears (In re Beshears)*, 182 B.R. 235, 239 (Bankr.E.D.Ark.1995)). The *McLaren* court further noted that other courts considered the more common badges of fraud were:

(1) actual or threatened litigation against the debtor;

(2) purported transfer of all or substantially all of the debtor's property;

(3) insolvency or other unmanageable indebtedness on the part of the debtor;

(4) a special relationship between the debtor and the transferee; and

(5) retention by the debtor of the property involved in the putative transfer.

*Id.* at 900 (citations omitted). Once the Trustee has established sufficient badges of fraud are present, he is entitled to a presumption of fraudulent intent. *Id.* (citations omitted). Thereafter, the burden shifts to the transferee to show some legitimate supervening purpose for transfers. *Id.* (citations omitted). Furthermore, actual harm is not required to set aside a fraudulent transfer under § 548(a)(1). *Krudy v. Scott (In re Scott)*, 227 B.R. 834, 843 (Bankr.S.D.Ind.1998). The court in *Scott* noted:

[A]ctual harm is not required; the trustee must only show that the debtor acted with the intent to hinder, delay or defraud creditors. While ordinarily there is no reason to seek, or a court to exercise its power, to avoid a transfer which has not harmed anyone, it is to be emphasized that fraud may be committed under section 548(a)(1) even though a fairly equivalent consideration may pass to the transferor and even though creditors are merely hindered or delayed.

(quoting *In re Sherman,* 67 F.3d 1348, 1355 (8th Cir.1995) (further quotations omitted)).

 "Where the transferee is in a position to dominate or control the debtor's disposition of his property, the transferee's intent to hinder, delay or defraud creditors may be imputed to the debtor." *Pirrone v. Toboroff (In re Vaniman Int'l, Inc.),* 22 B.R. 166, 183 (Bankr.E.D.N.Y. 1982) (citations omitted). When a conveyance is made with the actual intent to hinder, delay or defraud creditors, whether or not the debtor is insolvent is immaterial. *Id.* (citations omitted). Transfers to family members or relatives are subjected to close scrutiny and "the relationship of the parties in conjunction with other circumstances often makes a trustee's case compelling despite the absence of direct evidence of fraud." 5 *Collier on Bankruptcy,* ¶ 548.04[2][b], p. 548–28 (Lawrence P. King ed., 15th ed. rev.1999).

 Alternatively, under § 544(b), the Trustee is provided with rights of an actual unsecured creditor. The Trustee may exercise the rights of the creditor under state fraudulent transfer law. 5 *Collier on Bankruptcy,* ¶ 544.09[2], p. 544–18 (Lawrence P. King ed., 15th ed. rev. 1999). Oklahoma has adopted the Uniform Fraudulent Transfer Act ("UFTA") which is codified at Okla. Stat. Ann. tit. 24, § 116 (West 1987). Section 116 provides:

A. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

1. with actual intent to hinder, delay, or defraud any creditor of the debtor; or

2. without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

 a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or

 b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

In determining actual intent, factors to be considered are:

1. the transfer or obligation was to an insider;

2. the debtor retained possession or control of the property transferred after the transfer;

3. the transfer or obligation was disclosed or concealed;

4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

5. the transfer was of substantially all the debtor's assets;

6. the debtor absconded;

7. the debtor removed or concealed assets;

8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Okla. Stat. Ann. tit. 24, § 116(B) (West 1987). The purpose of the UFTA is to invalidate a transfer of assets made by the debtor if the transfer has the effect of placing assets out of the reach of its present and future creditors. *Burrows v. Burrows,* 886 P.2d 984 (Okla.1994). A debtor is insolvent if the sum of the debtor's debts is greater than all the debtor's assets determined at a fair value or if the debtor is generally not paying all of its debts as they are due. Okla. Stat. Ann. tit. 24, § 114(A) and (B) (West 1987).

■ Under § 548 and UFTA via § 544, the Court finds the transfer of the Hagee land was made with the actual intent to hinder, delay or defraud creditors. This transfer to Hagee and Smith merely served as a conduit by which Arbuckle Development received the property. The Debtor still had access to and use of the property. Although the transfer to Hagee and Smith was disclosed, the subsequent transfer to Arbuckle Development was concealed. On the eve of bankruptcy, the Debtor made payments to Pauline Bailey, to whom the Debtor was not even obligated. Other payments were made to Lena and Mike on pre-petition claims. Thus, the Court finds there are sufficient badges of fraud present to allow the Trustee a presumption of fraudulent intent. Therefore, the burden shifts to the Defendants to show some legitimate purpose. The Court finds none. There was no evidence presented showing the transfer of the Hagee land was in response to a foreclosure proceeding. There is certainly no evidence of a legitimate purpose for the Hagee land to be transferred to Arbuckle Development. Thus, the Trustee prevails on his second cause of action and may avoid the transfer of the Hagee land.

## C. TRUSTEE'S THIRD CAUSE OF ACTION

The Trustee seeks to avoid pre-petition payments pursuant to §§ 547, 548, 544 and the Oklahoma Fraudulent Transfer Act made to the Clancy defendants, specifically checks payable as follows:

(1) Payment to Mike Clancy of $11,900, dated April 5, 1997;

(2) Payment to Mike Clancy of $7,820.84 dated June 30, 1997;

(3) Payment to Lena Clancy of $30,313.74 dated June 30, 1997;

(4) Payment to Murray County Clerk of $96 dated June 30, 1997;

(5) Payment to Murray County Treasurer of $1,695.63 dated June 30, 1997; and

(6) Payment to Jerry Hagee of $7,557 dated May 13, 1997.

These pre-petition payments were not disclosed in the Debtor's schedules or statement of affairs. As stated above, the Trustee may avoid certain transfers as fraudulent transfers or as preferential transfers.

Lena admitted that the $96 check dated June 30, 1997 should have been paid from her personal funds, as well as $594.12 of the $1,695.63 check. Thus, the Court finds the Trustee is able to avoid those transfers and recover from Lena in the amount of $690.12.

■ Next, the Court will turn to the pre-petition payments to Mike in the amount of $19,720.84 and Lena in the amount of $30,313.74. These payments were to an insider, the transfer was not disclosed, and the Debtor and Lena were involved in litigation with FNB, the Debtor's largest creditor. There were other transfers which were not disclosed. At the time of these transfers, the Debtor was insolvent. The Court finds sufficient badges of fraud to presume these transfers were done with the intent to hinder, delay or defraud creditors and therefore are fraudulent transfers.

Thus, the Defendants must provide a legitimate explanation for these transfers. The only explanation offered was that

Mike Clancy was not independently wealthy and needed to be paid for his services. However, the Court finds it unlikely that he would not have continued working regardless of whether he was paid. The Defendants attempted to explain that the April 5, 1997 check was deposited into another of Debtor's operating accounts. This transaction is highly suspicious. The check was drawn on an account the Defendants allege belonged to the Debtor but it was in the name of Bob Richeson. The Court is not satisfied with the Defendants' explanation and therefore finds these transfers constitute fraudulent transfers.

■ The May 13, 1997 check to Jerry Hagee presents a different problem. Jerry Hagee is not an insider of the Debtor. This was a partial payment on the mortgage. In the Statement of Financial Affairs, Debtor listed it was making "regular payments on accounts." The Court does not believe that this payment caused the Debtor to become insolvent. The Court does not find this payment was a fraudulent transfer.

■ Next, the Court will look at whether the payment to Hagee is a preferential transfer. The Trustee seeks to avoid the transfer of the Hagee land as a preferential transfer pursuant to § 547 which provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The purpose of the Trustee's avoidance power is to insure all creditors receive equal distribution from assets available. *Gill v. Winn (In re Perma Pac. Properties)*, 983 F.2d 964 (10th Cir.1992). "It is well established that the fundamental inquiry under § 547(b) is whether the transfer diminished or depleted the debtor's estate." *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.)*, 220 B.R. 1005 (10th Cir. BAP 1998) aff'd 195 F.3d 568 (10th Cir.1999) (citing *Perma Pac. Properties*, 983 F.2d at 968). The transfer of the Hagee land was made to benefit a creditor on account of an antecedent debt. Section 547(b)(3) requires the debtor to be insolvent when the transfers were made. *Sunset Sales*, 220 B.R. at 1015. "A corporation is 'insolvent' according to the Bankruptcy Code when it has 'financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation,' exclusive of the property fraudulently transferred or exempt assets." *Id.* at 1015–16.

■ The Defendants argue that the transfers were in the ordinary course of business and as a result are not voidable. Section 547(c)(2)(B) creates a subjective test, i.e., whether the transfers were ordinary as between the parties. *Id.* at 1020. In determining whether the payments are ordinary as between the parties, courts look at the following factors:

(1) the length of time the parties were engaged in the transaction;

(2) whether the amount or form of tender differed from past practices;

(3) whether the creditor or debtor engaged in any unusual collection or payment activity; and

(4) the circumstances under which the payment was made.

*Sunset Sales,* 220 B.R. at 1020–21. The creditor has the burden of proof under § 547(c)(2) and must show all elements by a preponderance of the evidence. 11 U.S.C. § 547(d). Transfers to a fully secured creditor are not avoidable as preferences since the secured claim would be satisfied in full in a Chapter 7 proceeding. *Mather v. Borden (In re Griffith),* 194 B.R. 262, 267 (Bankr.E.D.Okla.1996). This payment was made to benefit a creditor on an antecedent debt made while the Debtor was insolvent and within 90 days of filing bankruptcy. However, transfers to a fully secured creditor are not avoidable. *Griffith,* supra. As a result, the Court finds that this payment to Hagee does not constitute a preferential transfer. For the above reasons, the Trustee prevails in part on this third cause of action.

### D. TRUSTEE'S FOURTH CAUSE OF ACTION

The Trustee seeks to recover a payment made by the Debtor to Pauline Bailey in the amount of $31,315.24. However, at the trial of this matter, Lena's counsel conceded that she would take responsibility for this debt. As a result, the Court finds that the Trustee may avoid the payment to Pauline Bailey and recover the amount from Lena pursuant to 11 U.S.C. § 550. Therefore, the Trustee prevails on his fourth cause of action.

### E. TRUSTEE'S FIFTH CAUSE OF ACTION

The Trustee seeks to recover several post-petition payments and transfers of property. He seeks recovery of payments to Acme in the amount of $20,000 and $33,000. The Trustee also seeks recovery of credit card payments which were not directly attributable to the Debtor. He seeks recovery of items removed from the estate, as well as reimbursement for the use of Honey Creek employees for Lena and Mike's personal use.

 The Trustee may avoid a transfer of property of the estate that occurs after the commencement of the case. 11 U.S.C. § 549(a). Section 363(c)(1) provides that a trustee authorized to do business may use property of the estate in the ordinary course of business without notice and a hearing. *Huennekens v. Marx (In re Springfield Contracting Corp.),* 154 B.R. 214, 225 (Bankr. E.D.Va.1993). A debtor-in-possession has the rights and powers of the trustee. 11 U.S.C. § 1107. There are two tests used in determining the ordinary course under § 363:(1) the horizontal dimension test and (2) the vertical dimension or creditor's expectation test. *Springfield Contracting,* 154 B.R. at 226. The horizontal test is "whether the post-petition transaction is of a type that other similar businesses would engage in as ordinary business." *Id.* (citations omitted). "The transaction occurs in the debtor-in-possession's ordinary course of business when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business." *Id.* (citations omitted).

 The vertical dimension or creditor's expectation test asks: "whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* (quoting *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391, 394 (S.D.N.Y.1983)).

 The Debtor purchased two tractors post-petition from Acme, which is an insider. Not surprisingly, there was no Bill of Sale created for this transaction. Although tractors are needed in the day to day operations of the Debtor, the purchase of these tractors is not part of the ordinary business of the Debtor. Furthermore, the

creditors would be subjected to economic risks they had not intended. This transaction required Court approval and this was not done. However, the tractors were returned to the Park after the Park was sold by the Trustee. As a result, the Trustee will not be allowed to recover the $20,000.

The $33,000 check which reflects it was a loan was also done without Court approval. At the time of trial, the Clancys miraculously produced an "Equipment Lease," and an invoice for excavation work which justified the check. Again, this lease and improvements are not part of the ordinary course of business. Additionally, these transactions subjected the creditors to additional economic risks. Therefore, the Trustee should recover the $33,000.

The Trustee also seeks to recover from Mike and Lena for Debtor's payment of their credit card debt. The testimony revealed that these credit cards were used because the Debtor could not obtain credit from its vendors. Although the Court does not condone the Debtor's use of credit cards, the Court heard no evidence that the personal expenses of Mike and Lena were not paid back to the Debtor. The Trustee presented substantial documents relating to the credit cards. However, there were notations regarding which expenses belonged to the Debtor and the Clancys personally. A former accountant of the Debtor testified that he or the Clancys made the determination of which expenses belonged to the Debtor and the Debtor was reimbursed for the Clancys' personal expenses. Thus, the Trustee cannot recover for these items.

Next, the Trustee seeks to recover the value of tools, equipment and vehicles from Lena or Mike. The testimony heard on this issue was that these items belonged to other entities controlled by the Clancys, and as a result, were not part of the Debtor's estate. Thus, the Trustee cannot recover the value of this equipment.

Lastly, the Trustee seeks to recover the value of services performed by Debtor's employees which were for the personal benefit of Mike and/or Lena. Mike testified that the employees might have spent 30 hours on personal matters but he believed the Debtor benefited indirectly. The materials from the Hagee land were used on a house for Debtor's employees. There was no evidence presented regarding the value of the services of these employees. For that reason, the Trustee cannot recover on this claim.

## F. TRUSTEE'S SIXTH CAUSE OF ACTION

Trustee next seeks a determination of the proof of claims of Trent Capital, ARRC, Lena Clancy and J. Michael Clancy. The Trustee alleges that Lena filed a false or fraudulent proof of claim on behalf of Trent Capital. Further, the Trustee asserts that the claims of Lena Clancy, J. Michael Clancy and ARRC should be subordinated since they are insider claims. Claims against the bankruptcy estate may be subordinated to the claims of other secured or unsecured creditors if the principles of equitable subordination so dictate. The party seeking the equitable subordination must show:

(1) the claimant has engaged in inequitable conduct;

(2) the conduct has injured creditors or given an unfair advantage to the claimant; and

(3) subordination is not inconsistent with the Bankruptcy Code.

*In re Castletons, Inc.*, 990 F.2d 551, 559 (10th Cir.1993) (citing *In re 5,000 Skelly Corp.*, 142 B.R. 442, 446 (Bankr.N.D.Okla. 1992)). Inequitable conduct may include fraud, or illegality, breach of fiduciary duties, under capitalization or the claimant's use of debtor as a mere instrumentality or alter ego. *Official Committee of Unsecured Creditors of Interstate Cigar Co. v. Bambu Sales, Inc. (In re Interstate Cigar Co.)*, 182 B.R. 675 (Bankr.E.D.N.Y. 1995) aff'd 166 F.3d 1200 (2d Cir.1998). "When the claimants are insiders of the

debtor, the claimant's conduct is closely scrutinized and the trustee need only prove that they breached a fiduciary duty or engaged in conduct that is somehow unfair." *Id.* at 679 (quoting *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1282 n. 13 (8th Cir.1988)). The authority to subordinate a claim when a creditor has acted inequitably is only allowed to the extent inequitable conduct actually caused injury to the bankruptcy estate or other creditors. *In re Sun OK Kim*, 89 B.R. 116 (D.Hawai'i 1987). Following the Plaintiff's presentation of unfair conduct, the Defendant has the burden to demonstrate good faith and fairness of the transactions. *Interstate Cigar*, 182 B.R. at 681.

 Trent Capital has filed a proof of claim which has attached to it three promissory notes. One note is dated October 12, 1995 in the amount of $60,000; one is dated January 12, 1995 in the amount of $30,000 and one is dated April 10, 1995 in the amount of $50,000. All three notes reflect the signature of Ronald Armitage and were purportedly notarized by Sheila McClure, Armitage's Administrative Assistant. Mr. Armitage testified that he did not sign these notes and further that the notary signature was not that of his Administrative Assistant. The $60,000 note reflects it was between Honey Creek and Trent Capital. The $30,000 note reflects it was between ARRC and Trent Capital. The $50,000 note reflects it was between Lena and Honey Creek. However, a check attached to the proof of claim in the amount of $50,000 was from Edith Trent to Honey Creek.

There is no evidence to refute Armitage's testimony that he did not sign the notes. Lena's only testimony was that the proceeds of these loans went into the Debtor's operations. However, the Court questions the veracity of this testimony since one note was not even between the Debtor and Trent Capital but was between ARRC and Trent Capital. Another note reflects that it is between Lena and the Debtor but funds were paid from Trent Capital. With respect to the Trent Capital proof of claim, the Court finds that it engaged in inequitable conduct. The conduct gives an unfair advantage to an insider. As a result, the Trent Capital claim must be subordinated.

 The Trustee also seeks subordination of Lena's claim. Lena filed a proof of claim for $694.66. The claim is for products she supposedly purchased and for her expenses. Mike filed a proof of claim in the amount of $18,429.09 for products purchased for the Park. From the receipts attached to Lena's proof of claim which are legible, the expenses are in excess of $700. The Court heard no evidence that these expenses were not attributable to the Debtor. The receipts attached to Mike's proof of claim total approximately $500. Mike seeks to recover $7,070 on the truck lease plus $1,528.80 for extra mileage. However, no lease agreement was presented but only a letter attempting to terminate this "lease." Mike also claims salary for January, 1999 in the amount of $3,000, for February 16–19, 1999 in the amount of $400 and three weeks of vacation in the amount of $4,500. Because the Court has found that Mike and Lena have engaged in inequitable conduct, the burden is on them to show good faith and fairness in these transactions. There has been no evidence that the expenses related to Lena's claim were not expenses of the Debtor. As to the lease, the Court finds that this transaction was not made in good faith and fairness. This lease was purportedly entered into post-petition and was done without Court approval. The Court finds that Lena should be allowed her claim for $694.66. Mike will be allowed his claim on the receipts attached to his proof of claim, not to exceed $500. Mike's claim for truck lease and extra mileage will be disallowed. Mike's claim for salary of $3,000 for January, 1999 will be allowed. Mike's claim for $400 for salary for February 16–19, 1999 will be denied, since the Trustee took over management of the Park on Febru-.

ary 11, 1999. Mike's claim for three weeks vacation for $4,500 will be denied.

■ Next, the Trustee seeks to subordinate the proof of claim filed by ARRC in the amount of $75,000. This proof of claim is based on a note signed by Ron Armitage. The proof of claim was executed by Lena as President of ARRC. Ron Armitage testified the Debtor signed the note for $75,000 and the proceeds were used to infuse equity into the Debtor for the dinosaur area. The Court finds that although ARRC is an insider, the transaction was fair and made in good faith. As a result, the ARRC proof of claim will not be subordinated.

## G. TRUSTEE'S SEVENTH CAUSE OF ACTION

■ The Trustee has presented evidence of a number of transactions orchestrated by Lena as manager of Honey Creek which amounted to a breach of fiduciary duty. It is well established that a debtor-in-possession is charged with certain duties and obligations upon the commencement of a case under chapter 11 of the Bankruptcy Code. See, 11 U.S.C. §§ 1106 and 1107. Primary among these duties is that a debtor-in-possession is a fiduciary to all of its creditors and equity security holders. *In re Bellevue Place Assocs.,* 171 B.R. 615 (Bankr.N.D.Ill.1994) (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 200 n. 3, 103 S.Ct. 2309, 2311, 76 L.Ed.2d 515 (1983)). When a debtor remains in possession, the directors of the debtor corporation bear essentially the same fiduciary responsibilities to creditors and shareholders as would the trustee if one was appointed. "Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) (citing *Wolf v. Weinstein,* 372 U.S. 633, 649–652,

83 S.Ct. 969, 979–980, 10 L.Ed.2d 33 (1963)).

■ Here, Honey Creek took on the duties and responsibilities of fiduciary as the debtor-in-possession. These duties were carried out by Honey Creek's principal, Lena. As principal, Lena owed the same fiduciary duties to creditors and shareholders. Specifically, these fiduciary duties were to exercise the measure of care, diligence and skill of a reasonably prudent person, and to be loyal to Honey Creek by avoiding conflicts of interest and the appearance of impropriety, maximizing the value of the estate, and refraining from self-dealing. See, *In re Insulfoams, Inc.,* 184 B.R. 694 (Bankr.W.D.Pa.1995).

■ To prevail on his claims of breach of fiduciary duty, the Trustee must prove that the director or manager did not act diligently to protect Honey Creek. He must show that Lena's actions were tainted by a conflict of interest, involved self-dealing, or did not treat all parties fairly. *Id.* As this Court's Findings of Fact indicate, Lena made unauthorized pre- and post-petition transfers from the estate to herself and companies she controlled to the detriment of creditors and to the benefit of herself; fraudulently transferred property; and otherwise engaged in inequitable conduct. Lena used her position of trust and control over the rights of other parties to further her own private interests. The Trustee has met his burden of proof on this issue. Accordingly, the Court finds that Lena breached her fiduciary duties in the operation of Honey Creek as Debtor–in–Possession.

■ The Trustee has not requested specific damages to compensate the estate for breach of fiduciary duty. Other courts considering damages in such cases have found that a case may be dismissed (*In re Wells,* 71 B.R. 554, 557 (Bankr.N.D.Ohio 1987)), a trustee may be appointed (*In re Microwave Products of America,* 102 B.R. 666 (Bankr.W.D.Tenn.1989)) or a fiduciary's claim will be equitably subordinated or

profits will be ordered disgorged (*Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3rd Cir.1998)). Also, monetary damages may be an appropriate remedy. *Plotner v. AT & T,* 172 B.R. 337, 343 (W.D.Okla.1994). Where a trustee is found to have breached his fiduciary duty, he may have personal liability for intentional breaches as well as liability in his official capacity. *Sherr v. Winkler,* 552 F.2d 1367 (10th Cir.1977). These same liability principles extend to debtor in possession cases as well. *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451 (6th Cir.1982). The damages thus awarded under the separate causes of action are sufficient to compensate the Trustee for the breach of fiduciary duty by Lena.

## CONCLUSION

This has been a most difficult case for the Court to decipher since there have been such a myriad of financial dealings between insiders and related entities. Most of these transactions can hardly be categorized as inadvertent or careless. What the Court has observed is a well thought out series of financial manipulation that flies in the face of what the most basic responsibilities are for a debtor-in-possession.

It has been clear from the outset of this case, as evidenced by the many hearings this Court has presided over, that reorganization and rehabilitation have never been objectives of this bankruptcy. This case is crystal clear. Lena and Mike have sought to market this Park to someone who would pay enough money to retire the note at Durant National Bank, and thus alleviate Lena's personal guaranty on the note. A sale price in this range has always been unrealistic. Lena never thought the Bank would sell the Park to anyone who would pay enough money to retire the note, so in effect, she would be stuck for any deficiency. This was a pipe dream because an animal theme park located in the Arbuckle Mountains of Oklahoma is just not going to bring the price of a park located in Dallas, San Antonio or Oklahoma City.

It appears to the Court that once reality set in that a price could not be obtained at a level to retire the bank note, the Clancys decided to help themselves to all available cash and assets, all to the detriment of the creditors in this case. This was done even after Lena won a state court suit which in effect held her not to be liable under her personal guaranty on the Honey Creek loan.

This case could be accurately described as a classic blueprint of how not to perform the duties of a debtor-in-possession. Only a cursory examination of the reports filed in the case and the many hearings would show that the United States Trustee's monitoring of this case left a lot to be desired. Never once did the United States Trustee's office bring to the Court's attention any of the gross misdeeds and mismanagement of the Park by the Clancys.

Lena has gone to great pains to try to sell the Court on the idea that she has been a "victim" who has been taken advantage of by Mr. Armitage and Durant Bank. Everything that has gone wrong in this case, from a business failure standpoint, Lena has always stood ready to play the blame game. That is, if something terrible happens at the Park, it is always someone else's fault. If she did something improper, or if she performed some act without Court approval, then it was because the United States Trustee's office or her own lawyer failed to advise her not to do it or that it was improper. The duties and responsibilities of the debtor-in-possession, a position of trust that rises to the highest level of fiduciary duty, simply were trampled in this case. The highest and only interests served in this case were the self interests of the Clancy family and their controlled entities. The Court has seen very few instances here where decisions were made by the debtor-in-possession that remotely benefited creditors.

Because the Court is under an obligation to adhere to legal principles construing the burden of proof required by the Trustee to prove the elements of the various causes of action by a preponderance of the evidence, the Court cannot in good conscience find the Trustee as the prevailing party on all his causes of action.

IT IS THEREFORE ORDERED that relief is granted and denied as follows:

On the Trustee's First Cause of Action, the Trustee is granted judgment against Lena in the amount of $296,827.

On the Trustee's Second Cause of Action, the Trustee prevails and the transfer of the Hagee land is avoided.

On the Trustee's Third Cause of Action, the Trustee's action to avoid the payment to Hagee is denied. The pre-petition payments to Mike in the amount of $19,720.94 and to Lena in the amount of $30,313.74 and $690.12 constitute fraudulent transfers.

On the Trustee's Fourth Cause of Action, the Trustee shall recover the amount of the payment to Pauline Bailey of $31,315.24 from Lena.

On the Trustee's Fifth Cause of Action, the Trustee shall not recover the post-petition payment to Acme of $20,000, credit card payments which were not directly attributable to the Debtor, the value of tools, equipment and vehicles, or the value of services performed by Debtor's employees for Mike and Lena. The Trustee shall recover from Lena and Acme the $33,000 post-petition payment on the equipment lease to Acme.

On the Trustee's Sixth Cause of Action, the claim of Trent Capital shall be subordinated; the claim of ARRC shall not be subordinated; and Lena's claim for $694.66 shall be allowed. Mike shall be allowed his claims in the amount of $500 for the receipts attached to his proof of claim; and $3,000 for salary for January, 1999. Mike's claims for the payment on the truck lease, extra mileage, the salary of $400 for February 16–19, 1999, and $4,500 for three weeks vacation are denied.

On the Trustee's Seventh Cause of Action, the relief is granted insofar as the Trustee has already prevailed on the First, Second, Third (partially), Fourth and Sixth Causes of Action.